**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION**

| | |
|---|---|
| **KENNETH PAXTON,** *as Next Friend of Alex Reed Paxton, deceased;* **and KATHRYN HARTLEY,** *as Next Friend of Alex Reed Paxton, deceased, and as Administrator of the Estate of Alex Reed Paxton,*<br><br>          *Plaintiffs,*<br><br>**v.**<br><br>**GEORGIA POWER COMPANY,**<br><br>          *Defendant and Third-Party Plaintiff,*<br><br>**v.**<br><br>  **GLENN INDUSTRIAL GROUP, LLC,**<br><br>          *Third-Party Defendant.* | **CIVIL ACTION NO.
4:22-cv-00081-TES** |

## ORDER DENYING PLAINTIFFS' MOTION TO REMAND

Situated on the Chattahoochee River at the border of Georgia and Alabama in

Columbus, Georgia, Defendant Georgia Power Company owns and operates Oliver

Dam, a commercial hydroelectric generation facility that supplies electric energy to

serve growing regional demand. While working as a commercial diver at the dam for

Glenn Industrial Group, LLC, Alex Reed Paxton descended into the water and found

himself trapped by a pipe within its infrastructure. Following his death, his parents,

Plaintiffs Kenneth Paxton and Kathryn Hartley, filed suit against Georgia Power in the State Court of Muscogee County, Georgia, under a state-law negligence theory. *See generally* [Doc. 1-1]. Georgia Power removed.

In its Notice of Removal [Doc. 1], Georgia Power notes four bases through which the Court has subject-matter jurisdiction: federal-question jurisdiction under 28 U.S.C. § 1331, federal-officer jurisdiction under 28 U.S.C. § 1442, admiralty jurisdiction under 28 U.S.C. § 1333, and diversity jurisdiction under 28 U.S.C. § 1332. *See generally* [Doc. 1]. However, at the outset of their Motion to Remand [Doc. 9], Plaintiffs argue that because Georgia Power is a citizen of Georgia, it cannot, "[u]nder the 'forum-defendant rule' in 28 U.S.C. § 1441(b)," rely on diversity of citizenship to remove their case. [Doc. 9, pp. 3–4]. As briefing progressed, Georgia Power clarified its removal positions by stating that it "does not rely on diversity of citizenship as a basis for removal" but "simply note[d]" that the diversity of citizenship between the parties in this case might be a possible jurisdictional route. [Doc. 10, p. 21]; [Doc. 1, ¶¶ 57–60]. To be sure, Georgia Power only points to federal-question, federal officer removal, and admiralty jurisdiction as its true "bas[e]s for removal." [Doc. 1, ¶¶ 15–17, 54–63]. Thus, the Court only focuses on whether any of those three bases noted by Georgia Power provide the Court with appropriate subject-matter jurisdiction.

### A.   Legal Standard

Federal courts only have the ability to adjudicate cases as "authorized by

Constitution and statute." *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 409 (11th Cir. 1999); *Gunn v. Minton*, 568 U.S. 251, 256 (2013). In other words, unless Article III of the Constitution provides the jurisdictional basis, federal courts simply have no authority to act without a statutory grant of subject-matter jurisdiction. *Univ. of S. Ala.*, 168 F.3d at 409, *Smith v. GTE, Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2001).

"On a motion to remand, the removing party bears the burden of showing the existence of federal subject[-]matter jurisdiction." *Conn. State Dental Ass'n v. Anthem Health Plans, Inc.*, 591 F.3d 1337, 1343 (11th Cir. 2009). Whenever there are uncertainties of a federal court's exercise of subject-matter jurisdiction, remand is the appropriate course of action. *Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11th Cir. 1994). With this is mind, let's get right to the three bases Georgia Power relies on to support its removal of Plaintiffs' case, and the all-important question of whether any of them provide a basis for federal jurisdiction.

### B.    Federal Officer Removal Jurisdiction

In its Response [Doc. 10] to Plaintiffs' efforts to remand their case back to state court, Georgia Power first relies on federal officer removal jurisdiction. [Doc. 10, pp. 3–11]. This type of subject-matter jurisdiction "is an incident of federal supremacy and is designed to provide federal officials with a federal forum in which to raise defenses arising from their official duties." *Caver v. Cent. Alabama Elec. Coop.*, 845 F.3d 1135, 1142 (11th Cir. 2017) (quoting *Florida v. Cohen*, 887 F.2d 1451, 1453 (11th Cir. 1989)). In

relevant part, the statutory grant of subject-matter jurisdiction provided by 28 U.S.C. §

1442 allows "[t]he United States or any agency thereof or any officer . . . of the United

States or of any agency thereof[]" to remove "[a] civil action . . . that is commenced in a

State court[.]" 28 U.S.C. § 1442(a)(1). But, because Georgia Power isn't a federal officer

or agency, it must satisfy a three-pronged test in order for subject-matter jurisdiction to

be appropriate § 1442(a)(1). *Caver*, 845 F.3d at 1142. Not only does Georgia Power have

to "show that it is a person within the meaning of the statute who acted under a federal

officer[,]" it also has to show—relative to a "causal connection" inquiry—"that it

performed the actions for which it is being sued under color of federal office[]" and that

it has a colorable federal defense to raise. *Id.* (citations omitted). "If the[se] [three]

statutory prerequisites are satisfied, [§] 1442(a)(1) provides an independent federal

jurisdictional basis." *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1427 (11th Cir. 1996)

### 1.    "Acting Under"

The first prong for federal officer removal is whether Georgia Power was a

person "acting under" a federal officer in its operation and maintenance of Oliver Dam.

*Caver*, 845 F.3d at 1142. Plaintiffs don't argue that Georgia Power isn't a "person" within

the meaning of the § 1442(a)(1). Instead, they argue that "Georgia Power has not shown,

and cannot show, that it was helping to carry out the tasks of a federal superior." [Doc.

9, p. 15 (citing *Caver*, 845 F.3d at 1143)]. In order to satisfy this "acting under" prong,

precedent makes clear that Georgia Power must "help federal officers fulfill a basic

governmental task that the government otherwise would have had to perform." *Caver*,

845 F.3d at 1143 (citing *Watson v. Philip Morris Cos.*, 551 U.S. 142, 153–54 (2007)). Here's

what Georgia Power had to offer in satisfying the "acting under" prong.

Georgia Power contends that it "owns, operates, maintains, and occupies, Oliver

Dam" pursuant to a license originally issued to it in 1959 by the Federal Energy

Regulatory Commission and re-issued to it in 2004 under the Federal Power Act, which

is, of course, legislation intended to create "a broad federal role in the development and

licensing of hydroelectric power." *California v. FERC*, 495 U.S. 490, 496 (1990); [Doc. 10-2,

O'Mara Aff., ¶ 7]. Essentially, according to Georgia Power's Hydro Licensing and

Compliance Supervisor, the rules and regulations of the license issued by the

Commission, as well as the Federal Power Act itself, control Georgia Power's operation

and maintenance of the dam. [*Id.* at ¶¶ 3–4, 7]; *see also* 16 U.S.C. § 803(c).

These license-based obligations are more than "permissive guidance" or "helpful

suggestions" to which Georgia Power may aspire. *Mitchell v. Advanced HCS, L.L.C.*, 28

F.4th 580, 590 (5th Cir. 2022); [Doc. 10, p. 7]. They are, as Georgia Power contends, based

on the plain-text of the statutory language regulating the development of water

power—"requirements." [Doc. 10, p. 7]. Licensees, like Georgia Power, are subject to the

"terms and conditions" set by Congress and "such further conditions, if any, as the

Commission shall prescribe[.]" 16 U.S.C. § 799. Thus, the Court concludes that the

Congressional subjugations imposed on Georgia Power by the license denote

governmental control, not governmental guidance. *Cf. Maglioli v. Alliance HC Holdings LLC*, 16 F.4th 393, 405 (3d. Cir. 2021).

Moreover, as a hydroelectric generation facility, federal law gives a Regional Engineer supervisory authority over Oliver Dam's "construction, operation, maintenance, use, repair, or modification" to ensure that it "function[s] safely for its intended purposes." 18 C.F.R. § 12.4(b). That said, however, regulation by the federal government or mere compliance with governmental regulation doesn't mean that a private entity can fall "within the scope of the statutory phrase 'acting under' a federal 'official[]'" and easily satisfy the basis for removal under § 1442(a)(1). *Watson*, 551 U.S. at 153. So, what does "acting under" really mean? The "acting under" relationship "typically includes subjection, guidance, or control[,]" and in the context of § 1442(a)(1), "the word 'under' must refer to what has been described as a relationship that involves 'acting in a certain capacity, considered in relation to one holding a superior position or office.'" *Id.* at 151. And, that is exactly what we have here. Georgia Power isn't simply "using the government's require[ments]," to generate hydroelectric power for a profit. *See Caver*, 845 F.3d at 1143 (citing *Watson*, 551 U.S. at 146). Despite Georgia Power's status as a "for-profit company," the Commission (and hence the federal government) possesses a "significant level of control" over its operations of Oliver Dam. *Caver*, 845 F.3d at 1143; [Doc. 9, p. 15]. In a very real sense, Georgia Power either operates the dam how the federal government says, or it doesn't operate it at all.

Georgia Power (according to its Chief Dam Safety Engineer) records "the operational and maintenance history of Oliver Dam" including "the dates, times, nature, and causes of any complete or partial shut-downs, suspensions of [dam] operations, or reservoir filling restrictions related to the safety of the [dam]" on behalf of the Commission. [Doc. 10-3, Barber Aff., ¶ 7]. Moreover, the Commission (via its issued license) ensures that Georgia Power, as the owner of Oliver Dam, "develop[s] and maintain[s] . . . a robust and focused dam safety program" so that "public safety, the environment, and project facilities" are protected. [*Id.* at ¶¶ 3, 6]. These things, coupled with the supervision of the Regional Engineer, "demonstrate the close and extensive relationship" consistent with other precedential holdings that allow private entities, like electrical power companies, to satisfy § 1442(a)(1)'s "acting under" requirement because of their recognized "role and purpose" in the federal system. *See, e.g., Caver,* 845 F.3d at 1143; *Ala. Power Co. v. Ala. Elec. Coop., Inc.,* 394 F.2d 672, 677 (5th Cir. 1968).[1]

Not only does the relationship between Georgia Power and the Commission support a conclusion that Georgia Power is "acting under" a federal officer, but the record clearly shows that "Georgia Power is furthering the federal government's

---

[1] "[T]he decisions of the United States Court of Appeals for the Fifth Circuit (the 'former Fifth' or the 'old Fifth'), as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit, for [the court of appeals], the district courts, and the bankruptcy courts . . . ." *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir. 1981).

'legitimate interest' in hydroelectric power and water power development." [Doc. 10, p. 8 (citing *Fed. Power Comm'n v. Union Elec. Co.*, 381 U.S. 90, 98 (1965))]. In other words, Georgia Power's operation of Oliver Dam helps the federal government fulfill a basic governmental task that it "otherwise would have had to perform" itself. *Caver*, 845 F.3d at 1143; [Doc. 10, p. 6]. A key aspect in determining whether § 1441(a)(1) is applicable begs a simple question: Is the private contractor helping the government produce an item that it needs? *Watson*, 551 U.S. at 153.

As a "commercial hydroelectric generation facility that provides a substantial amount of electric energy to serve growing regional demand," Oliver Dam aids the federal government with its "legitimate interest" in controlling the country's water resources for "navigation, irrigation, flood control, and, very prominently, hydroelectric power[.]" *Fed. Power Comm'n*, 381 U.S. at 98–99; [Doc. 10-1, Deshazo Aff., ¶ 5]. According to Georgia Power, its license "provides that its operation of . . . Oliver Dam is for 'improving and developing a waterway or waterways for the use or benefit of interstate and foreign commerce [and] for the utilization of water power development[.]'" [Doc. 10, p. 8 (quoting 21 F.P.C. 296, 303)]. Quite simply, without Georgia Power, the government would have to undertake the tasks relative to hydroelectric power in order to further its long-recognized legitimate interest in water power development. *Caver*, 845 F.3d at 1143–44; *Fed. Power Comm'n*, 381 U.S. at 98. Thus, taking all of the foregoing under consideration in connection with the broad application

due to the phrase "acting under," Georgia Power satisfies the first of the three statutory prerequisites to invoke federal officer removal jurisdiction under § 1442(a)(1). It has "show[n] that it is a person within the meaning of the statute who acted under a federal officer." *Caver*, 845 F.3d at 1142.

### 2. Causal Connection

Moving to the second prong, claims removed under § 1442(a)(1) must be "for or relating to any act" under color of federal office. *Caver*, 845 F.3d at 1144 (quoting 28 U.S.C. § 1442(a)(1)). This second prong asks whether Georgia Power's ownership, operation, maintenance, and occupation of Oliver Dam was under color of law. *Caver*, 845 F.3d at 1144 (citations omitted). "[F]or or relating to any act" speaks to the crux of negligence-based liability—to its causation element. 28 U.S.C. § 1442(a)(1); *Caver*, 845 F.3d at 1144. In other words, satisfaction of this second prong hinges on whether there is a causal connection between Alex Paxton's death and an act of Georgia Power that may form the basis of Plaintiffs' negligence claims. *Caver*, 845 F.3d at 1144 (citations omitted). The statutory phrasing—"relating to"[2]—is considered to be "broad and requires only 'a "connection" or "association" between the act in question and the federal office.'" *Id.* (citation omitted). In fact, the Eleventh Circuit recognizes that "[t]he hurdle erected by this requirement is quite low[.]" *Id.* (quoting *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137

---

[2] "In 2011, Congress amended § 1442(a)(1) to add the phrase 'or relating to,' which was intended to broaden the scope of acts that allow a federal officer to remove a case to federal court." *Caver v. Cent. Alabama Elec. Coop.*, 845 F.3d 1135, 1144 n.8 (11th Cir. 2017).

(2d Cir. 2008)).

With respect to causation, Plaintiffs allege that "[b]ut for Georgia Power's misconduct, [Alex Paxton] would not have died"; that "Georgia Power's misconduct proximately caused Alex Paxton's wrongful death"; that "[a]s a direct and proximate result of Georgia Power's negligence, Alex Paxton suffered conscious pain and suffering, both physical and mental"; and that "[a]s a direct and proximate result of Georgia Power's negligence, Alex Paxton lost his life." [Doc. 1-1, ¶¶ 45–48]. Based on the events surrounding their son's death, Plaintiffs argue that "the tortious conduct at issue involved inadequate . . . procedures" related to safety measures designed to make dam equipment temporarily inoperable. [Doc. 9, p. 17]; *see* [Doc. 1-1, ¶ 23]. But, recalling what we discussed above, the Commission, through the Regional Engineer, controls the "operation, maintenance, use, repair, or modification" of Oliver Dam. 18 C.F.R. § 12.4(b)(2)(iv); [Doc. 10-2, O'Mara Aff., ¶ 7]. In fact, elsewhere in 18 C.F.R. § 12.4, one of the goals of the Regional Engineer is to ensure that Oliver Dam "function[s] safely for its intended purposes." 18 C.F.R. § 12.4(b)(1)(i). With deference to the breadth applicable to the phrase "or relating to," Georgia Power's conduct certainly falls within this ambit. Plaintiffs' own contention proves as much.

They contend that "the tortious conduct . . . involved inadequate . . . procedures." [Doc. 9, p. 17]. The Commission requires Georgia Power to develop a Dam Safety Program. [Doc. 10-3, Barber Aff., ¶ 6]. "[A]t a minimum," Georgia Power must

include sections related to "policy, objectives, and expectations" for dam safety;

"[r]esponsibilities for dam safety"; a "training program" for dam safety; and sections

about "[c]ommunication, coordination, reporting, and reports"; "[r]ecord keeping and

databases; and "[c]ontinuous improvement." 18 C.F.R. § 12.63. Given the length of

Oliver Dam's operation, the Regional Engineer has undoubtedly reviewed Georgia

Power's Dam Safety Program developed in its compliance with the Commission's

requirements for safety protocol. [Doc. 10-3, Barber Aff., ¶ 6]. If there were, in fact,

"inadequate . . . procedures" followed on the day of Alex Paxton's death, they were

nonetheless procedures that the Regional Engineer approved and allowed Georgia

Power to use and follow—or not follow.[3] Fact remains, the procedures still had the

Regional Engineer's stamp of approval. *See California v. FERC*, 495 U.S. at 494

(recognizing that the Federal Power Act authorizes the Commission to issue licenses

subject to the conditions that the Commission "*deems best suited* for power development

and other public uses of the waters") (emphasis added); *see also* 16 U.S.C. § 803(a)(1).

Thus, the Commission, through its Regional Engineer, "set[s] the appropriate duty of

care for dam operators[]"—not state law, and Georgia Power's ownership, operation,

maintenance, and occupation of Oliver Dam was under color of law. *Caver*, 845 F.3d at

1144 (citations omitted); *Simmons v. Sabine River Auth. Louisiana*, 732 F.3d 469, 476 (5th

---

[3] Importantly, though, "in no event shall the United States be liable" "for . . . damages occasioned to the property of others by the construction, maintenance, or operation of" a hydroelectric generation facility regulated by the Commission. 16 U.S.C. § 803(c).

Cir. 2012), *cert denied*, 134 S. Ct. 1876 (2014).

### 3. Colorable Federal Defense

Finally, in order to avoid remand, the third prong that Georgia Power must meet looks to its defenses related to the negligence claims asserted against it. Namely, whether Georgia Power "has raised a colorable federal defense." *Caver*, 845 F.3d at 1145 (citations omitted). The Eleventh Circuit, by virtue of the Supreme Court's insistence, "gives this portion of § 1442(a)(1) a broad reading so as to encompass all cases where federal officers can raise a colorable defense arising out of their duty to enforce federal law." *Id.* at 1145 (citing *Cohen*, 887 F.2d at 1454 n.4); *Willingham v. Morgan*, 395 U.S. 402, 406–07 (1969). After all, "[o]ne of the primary purposes of the [federal officer] removal statute—as its history clearly demonstrates—was to have [federal] defenses litigated in the federal courts." *Willingham*, 395 U.S. at 407.

Normally, it is not enough to predicate removal of a case from state to federal court on a defense. *See Louisville & Nashville R. Co. v. Mottley*, 211 U.S. 149, 152 (1908). Federal subject-matter jurisdiction is usually conferred only by a plaintiff's well-pled allegations on the face of the complaint. *Jefferson Cnty. v. Acker*, 527 U.S. 423, 430–31 (1999) (citing *Mottley*, 211 U.S. at 152). However, suits against federal officers are the exception to the well-pled complaint rule. *Acker*, 527 U.S. at 446 (Scalia, J., concurring). "Under the federal officer removal statute, suits against federal officers may be removed despite the nonfederal cast of the complaint; the federal-question element is

met if the defense depends on federal law." *Id.* at 431. The federal defense "need only be plausible; its ultimate validity is not to be determined at the time of removal.'" *Caver*, 845 F.3d at 1145 (quoting *Magnin*, 91 F.3d at 1427). With that in mind, let's see what Georgia Power raises as its colorable federal defense.

Here, Georgia Power, among some 18 other defenses, asserts federal preemption. [Doc. 4, pp. 1–4]. Based on the Supremacy Clause, federal preemption provides that federal law "shall be the supreme Law of the Land." *Simmons*, 732 F.3d at 473 (quoting U.S. Const. art. VI, cl. 2). Of the three types of preemption—express, conflict, and field—Georgia Power argues that the Federal Power Act has been interpreted by the Supreme Court, *see California v. FERC*, *supra*, to "occupy[] the field of public water use and power generation except for water use rights." *Kurns v. Railroad Friction Prods. Corp.*, 565 U.S. 625, 630–31 (2012); [Doc. 10, p. 11 (quoting *Simmons*, 732 F.3d at 476)]. Given that power generation has always been a main character of the federal government's interest, it is no surprise that Congress gave the Commission the "final authority to establish license conditions [as well as] a broad and paramount federal regulatory role." *California v. FERC*, 495 U.S. 499–500; *Fed. Power Comm'n*, 381 U.S. at 98–99. Consistent with other courts to have considered the issue, it is a license's conditions established by this regulatory role that sets the standard of care for the "construction, operation, maintenance, use, repair, or modification" of a hydroelectric generation facility like Oliver Dam. 18 C.F.R. § 12.4(b); *see e.g.*, *Simmons*, 732 F.3d 476–77. Given how and where

Alex Paxton's death came about, state law cannot set the governing standard of care for Plaintiffs' negligence-based theory of recovery. *City of Lowell v. ENEL N. Am., Inc.*, 796 F. Supp. 2d 225, 231 (D. Mass.2011) (citation omitted) (holding that a "negligence claim is preempted by the [Commission's] license because [the plaintiff] cannot use state tort law to prevent [the Commission's licensee] from doing something that [the Commission] has sanctioned" and describing the negligence claim as a "collateral attack on the [Commission's] license"). The standard of care is, as Georgia Power argues, preempted by what it included—and the Regional Engineer approved—in its Dam Safety Program. Accordingly, Georgia Power has raised a colorful federal defense.

In all, Georgia Power has satisfied all three of the statutory prerequisites to justify its removal of Plaintiffs' case pursuant to federal officer removal jurisdiction under § 1442(a)(1). *Caver*, 845 F.3d at 1142; *Magnin*, 91 F.3d at 1427.

## C.   <u>Federal-Question and Admiralty Jurisdiction</u>

As stated above, Georgia Power also based its removal of Plaintiffs' case on federal-question and admiralty jurisdiction under 28 U.S.C. §§ 1331, 1333. [Doc. 1, ¶¶ 18–24, 38–53]. Since subject-matter jurisdiction exists under federal removal officer jurisdiction, the Court has a separate and independent jurisdictional basis to hear Plaintiffs' case. Thus, unless further factual development pulls their case from federal officer removal jurisdiction, the Court sees no need—at this time—to address whether it has subject-matter jurisdiction under federal-question or admiralty jurisdiction. Should

federal officer removal jurisdiction prove to be an improper basis for Georgia Power's removal of Plaintiffs' case, the Court, in accordance with its "independent obligation to determine whether subject-matter jurisdiction exists," will consider whether Plaintiffs' case was also removable under either § 1331 or § 1333. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).

D.    <u>**Conclusion**</u>

For now, though, the Court has subject-matter jurisdiction through the federal officer removal statute, and it **DENIES** Plaintiffs' Motion to Remand [Doc. 9].

**SO ORDERED**, this 3rd day of October, 2022.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**