## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## COLUMBUS DIVISION

| | |
|---|---|
| **KENNETH PAXTON,** *as Next Friend of Alex Reed Paxton, deceased;* **and KATHRYN HARTLEY,** *as Next Friend of Alex Reed Paxton, deceased, and as Administrator of the Estate of Alex Reed Paxton,*<br><br>        *Plaintiffs,*<br><br>**v.**<br><br>**GEORGIA POWER COMPANY,**<br><br>        *Defendant and Third-Party Plaintiff,*<br><br>**v.**<br><br>  **GLENN INDUSTRIAL GROUP, LLC,**<br><br>        *Third-Party Defendant.* | **CIVIL ACTION NO.**<br>**4:22-cv-00081-TES** |

## MEMORANDUM OPINION AND ORDER

        Situated on the Chattahoochee River at the border of Georgia and Alabama in

Columbus, Georgia, Defendant Georgia Power Company owns and operates Oliver

Dam, a commercial hydroelectric generation facility that supplies electric energy to

serve growing regional demand. While working as a commercial diver at the dam for

Glenn Industrial Group, LLC, Alex Reed Paxton descended into the water, got trapped

by a pipe within its infrastructure, and tragically drowned. Following his death, his

parents, Plaintiffs Kenneth Paxton and Kathryn Hartley, filed suit against Georgia

Power in the State Court of Muscogee County, Georgia, under a state-law negligence

theory. *See generally* [Doc. 1-1]; [Doc. 9-1]. Georgia Power removed.

In its Notice of Removal [Doc. 1], Georgia Power notes four bases through which

the Court has subject-matter jurisdiction: federal-question jurisdiction under 28 U.S.C. §

1331, federal officer jurisdiction under 28 U.S.C. § 1442, admiralty jurisdiction under 28

U.S.C. § 1333, and diversity jurisdiction under 28 U.S.C. § 1332. *See generally* [Doc. 1].

However, at the outset of their Motion to Remand [Doc. 9], Plaintiffs argue that because

Georgia Power is a citizen of Georgia, it cannot, "[u]nder the 'forum-defendant rule' in

28 U.S.C. § 1441(b)," rely on diversity of citizenship to remove their case. [Doc. 9, pp. 3–

4]. As briefing progressed, Georgia Power clarified its removal positions by stating that

it "does not rely on diversity of citizenship as a basis for removal" but "simply note[d]"

that the diversity of citizenship between the parties in this case might be a possible

jurisdictional route. [Doc. 10, p. 21]; [Doc. 1, ¶¶ 57–60]. To be sure, Georgia Power only

points to federal-question, federal officer removal, and admiralty jurisdiction as its true

"bas[e]s for removal." [Doc. 1, ¶¶ 15–17, 54–63]. Thus, the Court only focuses on

whether any of those three bases provide it with appropriate subject-matter jurisdiction.

In a previous Order [Doc. 21], the Court denied Plaintiffs' efforts to remand this

case back to state court. Ruling that federal officer jurisdiction provided a permissible

jurisdictional avenue, the Court halted its analysis and didn't "simultaneously address"

whether federal-question or admiralty jurisdiction provided it with additional means, or additional authority, to adjudicate this case. [Doc. 24, p. 3]; *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (discussing that subject-matter jurisdiction goes to a court's "statutory or constitutional *power* to adjudicate [a] case[]"). Respectfully adamant that federal officer jurisdiction—or any of the other jurisdictional routes for that matter—isn't the way to go, Plaintiffs now seek reconsideration or, alternatively, interlocutory appellate review of the Court's previous ruling pursuant to 28 U.S.C. § 1292(b). [Doc. 23, pp. 1, 11]. However, § 1292 "disallows appeals 'from any decision which is tentative, informal[,] or incomplete' or on any matter that 'remains open, unfinished, or inconclusive.'" *Consumer Fin. Prot. Bureau v. Frederick J. Hanna & Assocs., P.C.*, 165 F. Supp. 3d 1330, 1334 (N.D. Ga. 2015) (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949)).

Since the Court deferred ruling on Georgia Power's other two bases for removal, the jurisdictional issues presented to it could be deemed "unfinished" under § 1292(b). [Doc. 21, pp. 14–15]. So, in an effort to be as thorough and efficient as possible, the Court must first decide whether federal-question or admiralty jurisdiction provide it with additional statutory bases to exercise its subject-matter jurisdiction. After determining these remaining two bases, the Court must then consider Plaintiffs' Motion for a Certificate for Interlocutory Review [Doc. 23]. Accordingly, the Court **VACATES** and **WITHDRAWS** its previous Order Denying Plaintiffs' Motion to Remand [Doc. 21]

dated October 3, 2022, and it issues this Memorandum Opinion addressing each

jurisdictional argument presented to it as well as Plaintiffs' efforts to obtain

interlocutory review.

A.    **Legal Standard**

Federal courts only have the ability to adjudicate cases as "authorized by

Constitution and statute." *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 409 (11th Cir.

1999); *Gunn v. Minton*, 568 U.S. 251, 256 (2013). In other words, unless Article III of the

Constitution provides the jurisdictional basis, federal courts simply have no authority to

act without a statutory grant of subject-matter jurisdiction. *Univ. of S. Ala.*, 168 F.3d at

409; *Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2001).

"On a motion to remand, the removing party bears the burden of showing the

existence of federal subject[-]matter jurisdiction." *Conn. State Dental Ass'n v. Anthem*

*Health Plans, Inc.*, 591 F.3d 1337, 1343 (11th Cir. 2009). When a party challenges "the

existence of [subject-matter] jurisdiction in fact," the Court may consider matters

outside the pleadings, such as testimony and affidavits. *Lawrence v. Dunbar*, 919 F.2d

1525, 1528–29 (11th Cir. 1990) (per curiam). Whenever there are uncertainties of a

federal court's exercise of subject-matter jurisdiction, remand is the appropriate course

of action. *Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11th Cir. 1994). With this is mind,

let's get right to the three bases Georgia Power relies on to support its removal of

Plaintiffs' case and the all-important question of whether any of them provide a basis

for federal subject-matter jurisdiction.

### B.   <u>Federal Officer Removal Jurisdiction</u>

In its Response [Doc. 10] to Plaintiffs' efforts to remand their case back to state court, Georgia Power first relies on federal officer removal jurisdiction. [Doc. 10, pp. 3–11]. This type of subject-matter jurisdiction "is an incident of federal supremacy and is designed to provide federal officials with a federal forum in which to raise defenses arising from their official duties." *Caver v. Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1142 (11th Cir. 2017) (quoting *Florida v. Cohen*, 887 F.2d 1451, 1453 (11th Cir. 1989)). In relevant part, the statutory grant of subject-matter jurisdiction provided by 28 U.S.C. § 1442 allows "[t]he United States or any agency thereof or any officer . . . of the United States or of any agency thereof[]" to remove "[a] civil action . . . that is commenced in a State court[.]" 28 U.S.C. § 1442(a)(1). But, because Georgia Power isn't a federal officer or agency, it must satisfy a three-pronged test in order for subject-matter jurisdiction to attach under § 1442(a)(1). *Caver*, 845 F.3d at 1142. Not only does Georgia Power have to "show that it is a person within the meaning of the statute who acted under a federal officer[,]" it also has to show—relative to a "causal connection" inquiry—"that it performed the actions for which it is being sued under color of federal office[]" and that it has a colorable federal defense to raise. *Id.* (citations omitted). "If the[se] [three] statutory prerequisites are satisfied, [§] 1442(a)(1) provides an independent federal jurisdictional basis." *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1427 (11th Cir.

1996).

### 1.   "Acting Under"

The first prong for federal officer removal is whether Georgia Power was a person "acting under" a federal officer in its operation and maintenance of Oliver Dam. *Caver*, 845 F.3d at 1142. Plaintiffs don't argue that Georgia Power isn't a "person" within the meaning of the § 1442(a)(1). Instead, they argue that "Georgia Power has not shown, and cannot show, that it was helping to carry out the tasks of a federal superior." [Doc. 9, p. 15 (citing *Caver*, 845 F.3d at 1143)]. In order to satisfy the "acting under" prong, precedent makes clear that Georgia Power must "help federal officers fulfill a basic governmental task that the government otherwise would have had to perform." *Caver*, 845 F.3d at 1143 (citing *Watson v. Philip Morris Cos.*, 551 U.S. 142, 153–54 (2007)). Here's what Georgia Power had to offer in satisfying that prong.

Georgia Power contends that it "owns, operates, maintains, and occupies, Oliver Dam" pursuant to a license[1] originally issued to it in 1959 by the Federal Energy Regulatory Commission ("FERC") and re-issued to it in 2004 under the Federal Power Act ("FPA"), which is, of course, legislation intended to create "a broad federal role in the development and licensing of hydroelectric power." *California v. F.E.R.C.*, 495 U.S.

---

[1] The order issuing Georgia Power's FERC license may be found at 21 F.P.C. 296, 1959 WL 3193. Although Georgia Power did not include its license on the record for the Court's consideration, it does cite to it in support of its various jurisdictional arguments. Nevertheless, since Georgia Power's FERC license is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned[]" the Court takes judicial notice of it. Fed. R. Evid. 201(b); *see also* Fed. R. Evid. 201(c)(1) ("The court . . . may take judicial notice on its own[.]").

490, 496 (1990); [Doc. 10-2, O'Mara Aff., ¶ 7]; *see also* 16 U.S.C. § 791–828. Essentially, according to Georgia Power's Hydro Licensing and Compliance Supervisor, the rules and regulations of the license issued by FERC, as well as the FPA itself, control Georgia Power's operation and maintenance of Oliver Dam. [Doc. 10-2, O'Mara Aff., ¶¶ 3–4, 7]; *see also* 16 U.S.C. § 803(c).

These license-based obligations are more than "permissive guidance" or "helpful suggestions" to which Georgia Power may aspire. *Mitchell v. Advanced HCS, L.L.C.*, 28 F.4th 580, 590 (5th Cir. 2022); [Doc. 10, p. 7]. They are, as Georgia Power contends, based on the plain text of the statutory language regulating the development of water power—"requirements." [Doc. 10, p. 7]. Licensees, like Georgia Power, are subject to the "terms and conditions" set by Congress and "such further conditions, if any, as [FERC] shall prescribe[.]" 16 U.S.C. § 799. Thus, the Court concludes that the congressional subjugations imposed on Georgia Power by the FERC license denote governmental control, not governmental guidance. *Cf. Maglioli v. Alliance HC Holdings LLC*, 16 F.4th 393, 405 (3d Cir. 2021).

Moreover, as a hydroelectric generation facility, federal law gives a Regional Engineer supervisory authority over Oliver Dam's "construction, operation, maintenance, use, repair, or modification" to ensure that it "function[s] safely for its intended purposes." 18 C.F.R. § 12.4(b). That said, however, regulation by the federal government or mere compliance with governmental regulation doesn't mean that a

private entity, like Georgia Power, can fall "within the scope of the statutory phrase 'acting under' a federal 'official[]'" and easily satisfy the basis for removal under § 1442(a)(1). *Watson*, 551 U.S. at 153. So, what does "acting under" really mean? The "acting under" relationship "typically includes subjection, guidance, or control[,]" and in the context of § 1442(a)(1), "the word 'under' must refer to what has been described as a relationship that involves 'acting in a certain capacity, considered in relation to one holding a superior position or office.'" *Id.* at 151. That is exactly what we have here.

Georgia Power isn't simply "using the government's require[ments]" to generate hydroelectric power for a profit. *See Caver*, 845 F.3d at 1143 (citing *Watson*, 551 U.S. at 146). Despite its status as a "for-profit company," FERC (and hence the federal government) possesses a "significant level of control" over Georgia Power's operations of Oliver Dam. *Caver*, 845 F.3d at 1143; [Doc. 9, p. 15]. In a very real sense, Georgia Power either operates the dam how the federal government says, or it doesn't operate it at all.

Georgia Power (according to its Chief Dam Safety Engineer) records "the operational and maintenance history of Oliver Dam" including "the dates, times, nature, and causes of any complete or partial shut-downs, suspensions of [dam] operations, or reservoir filling restrictions related to the safety of the [dam]" on behalf of FERC. [Doc. 10-3, Barber Aff., ¶ 7]. Moreover, FERC (via its issued license) ensures that Georgia Power, as the owner of Oliver Dam, "develop[s] and maintain[s] . . . a

8

robust and focused dam safety program" so that "public safety, the environment, and project facilities" are protected. [*Id.* at ¶¶ 3, 6]. These things, coupled with the supervision of FERC's Regional Engineer, "demonstrate the close and extensive relationship" consistent with other precedential holdings that allow private entities, like electrical power companies, to satisfy § 1442(a)(1)'s "acting under" requirement given their recognized "role and purpose" in the federal system. *See, e.g., Caver*, 845 F.3d at 1143; *Ala. Power Co. v. Ala. Elec. Coop., Inc.*, 394 F.2d 672, 677 (5th Cir. 1968).[2]

Not only does the relationship between Georgia Power and FERC support a conclusion that Georgia Power is "acting under" a federal officer, but the record clearly shows that "Georgia Power is furthering the federal government's 'legitimate interest' in hydroelectric power and water power development." [Doc. 10, p. 8 (citing *Fed. Power Comm'n v. Union Elec. Co.*, 381 U.S. 90, 98 (1965))]. In other words, Georgia Power's operation of Oliver Dam helps the federal government fulfill a basic governmental task that it "otherwise would have had to perform" itself. *Caver*, 845 F.3d at 1143; [Doc. 10, p. 6]. A key aspect in determining whether § 1441(a)(1) is applicable begs a simple question: Is the private contractor helping the government produce an item that it needs? *Watson*, 551 U.S. at 153.

---

[2] "[T]he decisions of the United States Court of Appeals for the Fifth Circuit (the 'former Fifth' or the 'old Fifth'), as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit, for [the court of appeals], the district courts, and the bankruptcy courts . . . ." *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

As a "commercial hydroelectric generation facility that provides a substantial amount of electric energy to serve growing regional demand," Oliver Dam aids the federal government with its "legitimate interest" in controlling the country's water resources for "navigation, irrigation, flood control, and, very prominently, hydroelectric power[.]" *Fed. Power Comm'n*, 381 U.S. at 98–99; [Doc. 10-1, Deshazo Aff., ¶ 5]. Georgia Power notes that its license "provides that its operation of . . . Oliver Dam is for 'improving and developing a waterway or waterways for the use or benefit of interstate and foreign commerce [and] for the utilization of water power development[.]'" [Doc. 10, p. 8 (quoting 21 F.P.C. 296, 303)]. Quite simply, without Georgia Power, the government would have to undertake the tasks relative to hydroelectric power in order to further its long-recognized legitimate interest in water power development. *Caver*, 845 F.3d at 1143–44; *Fed. Power Comm'n*, 381 U.S. at 98. Thus, taking all of the foregoing into consideration in connection with the broad application due to the phrase "acting under," Georgia Power satisfies the first of the three statutory prerequisites to invoke subject-matter jurisdiction under § 1442(a)(1). It has "show[n] that it is a person within the meaning of the statute who acted under a federal officer." *Caver*, 845 F.3d at 1142.

### 2.    Causal Connection

Moving to the second prong, claims removed under § 1442(a)(1) must be "for or relating to any act" under color of federal office. *Caver*, 845 F.3d at 1144 (quoting 28 U.S.C. § 1442(a)(1)). This second prong asks whether Georgia Power's ownership,

operation, maintenance, and occupation of Oliver Dam was under color of law. *Caver*, 845 F.3d at 1144 (citations omitted). "[F]or or relating to any act" speaks to the crux of negligence-based liability—to its causation element. 28 U.S.C. § 1442(a)(1); *Caver*, 845 F.3d at 1144. In other words, satisfaction of this second prong hinges on whether there is a causal connection between Alex Paxton's death and an act of Georgia Power that may form the basis of Plaintiffs' negligence claims. *Caver*, 845 F.3d at 1144 (citations omitted). The statutory phrasing—"relating to"[3]—is considered to be "broad and requires only 'a "connection" or "association" between the act in question and the federal office.'" *Id.* (citation omitted). In fact, the Eleventh Circuit recognizes that "[t]he hurdle erected by this requirement is quite low[.]" *Id.* (quoting *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008)).

With respect to causation, Plaintiffs allege that "[b]ut for Georgia Power's misconduct, [Alex Paxton] would not have died"; that "Georgia Power's misconduct proximately caused Alex Paxton's wrongful death"; that "[a]s a direct and proximate result of Georgia Power's negligence, Alex Paxton suffered conscious pain and suffering, both physical and mental"; and that "[a]s a direct and proximate result of Georgia Power's negligence, Alex Paxton lost his life." [Doc. 9-1, ¶¶ 45–48]. Based on the events surrounding their son's death, Plaintiffs argue that "the tortious conduct at

---

[3] "In 2011, Congress amended § 1442(a)(1) to add the phrase 'or relating to,' which was intended to broaden the scope of acts that allow a federal officer to remove a case to federal court." *Cent. Ala. Elec. Coop.*, 845 F.3d at 1144 n.8.

issue involved inadequate . . . procedures" related to safety measures designed to make dam equipment temporarily inoperable. [Doc. 9, p. 17]; *see* [Doc. 9-1, ¶ 23]. But, recalling what we discussed above, FERC, through its Regional Engineer, controls the "operation, maintenance, use, repair, or modification" of Oliver Dam. 18 C.F.R. § 12.4(b)(2)(iv); [Doc. 10-2, O'Mara Aff., ¶ 7]. In fact, elsewhere in 18 C.F.R. § 12.4, one of the goals of the Regional Engineer is to ensure that Oliver Dam "function[s] safely for its intended purposes." 18 C.F.R. § 12.4(b)(1)(i). With deference to the breadth applicable to the phrase "relating to," Georgia Power's conduct certainly falls within this ambit. Plaintiffs' own contention proves as much.

They contend that "the tortious conduct . . . involved inadequate . . . procedures." [Doc. 9, p. 17]. FERC requires Georgia Power to develop a Dam Safety Program. [Doc. 10-3, Barber Aff., ¶ 6]. "[A]t a minimum," Georgia Power must include sections related to "policy, objectives, and expectations" for dam safety; "[r]esponsibilities for dam safety"; a "training program" for dam safety; and sections about "[c]ommunication, coordination, reporting, and reports"; "[r]ecord keeping and databases; and "[c]ontinuous improvement." 18 C.F.R. § 12.63. With how long Oliver Dam has been in operation, FERC's Regional Engineer has undoubtedly reviewed Georgia Power's Dam Safety Program developed in its compliance with FERC's requirements for safety protocol. [Doc. 10-3, Barber Aff., ¶ 6]. If there were, in fact, "inadequate . . . procedures" followed on the day of Alex Paxton's death, they were

nonetheless procedures that FERC's Regional Engineer approved and allowed Georgia Power to use and follow—or not follow.[4] Fact remains, the procedures still had a stamp of approval by FERC's Regional Engineer. *See California*, 495 U.S. at 494 (recognizing that the FPA authorizes FERC to issue licenses subject to the conditions that FERC "*deems best suited* for power development and other public uses of the waters*") (emphasis added); *see also* 16 U.S.C. § 803(a)(1). Thus, FERC, through its Regional Engineer, "set[s] the appropriate duty of care for dam operators[]"—not state law, and Georgia Power's ownership, operation, maintenance, and occupation of Oliver Dam was under color of law.[5] *Caver*, 845 F.3d at 1144 (citations omitted); *Simmons v. Sabine River Auth. La.*, 732 F.3d 469, 476 (5th Cir. 2012), *cert denied*, 134 S. Ct. 1876 (2014).

### 3.     Colorable Federal Defense

Finally, in order to avoid remand, the third prong Georgia Power must meet looks to its defenses related to the negligence claims asserted against it. Namely, whether Georgia Power "has raised a colorable federal defense." *Caver*, 845 F.3d at 1145 (citations omitted). The Eleventh Circuit, by virtue of the Supreme Court's insistence, "gives this portion of § 1442(a)(1) a broad reading so as to encompass all cases where federal officers can raise a colorable defense arising out of their duty to enforce federal

---

[4] Importantly, though, "in no event shall the United States be liable" "for . . . damages occasioned to the property of others by the construction, maintenance, or operation of" a hydroelectric generation facility regulated by FERC. 16 U.S.C. § 803(c).

[5] The Court's conclusion that the duty of care is set by the FERC license is bolstered when considering the Court's subject-matter jurisdiction under 28 U.S.C. § 1331. *See* Section (C)(1), *infra*.

law." *Id.* at 1145 (citing *Cohen*, 887 F.2d at 1454 n.4); *Willingham v. Morgan*, 395 U.S. 402, 406–07 (1969). After all, "[o]ne of the primary purposes of the [federal officer] removal statute—as its history clearly demonstrates—was to have [federal] defenses litigated in the federal courts." *Willingham*, 395 U.S. at 407.

Normally, it is not enough to predicate removal of a case from state to federal court on a defense. *See Louisville & Nashville R. Co. v. Mottley*, 211 U.S. 149, 152 (1908). Federal subject-matter jurisdiction is usually conferred only by a plaintiff's well-pled allegations on the face of the complaint. *Jefferson Cnty. v. Acker*, 527 U.S. 423, 430–31 (1999) (citing *Mottley*, 211 U.S. at 152). However, suits against federal officers are the exception to the well-pled complaint rule. *Acker*, 527 U.S. at 446 (Scalia, J., concurring). "Under the federal officer removal statute, suits against federal officers may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Id.* at 431. The federal defense "need only be plausible; its ultimate validity is not to be determined at the time of removal.'" *Caver*, 845 F.3d at 1145 (quoting *Magnin*, 91 F.3d at 1427). With that in mind, let's see what Georgia Power raises as its colorable federal defense.

Here, Georgia Power, among some 18 other defenses, asserts federal preemption. [Doc. 4, pp. 1–4]. Based on the Supremacy Clause, federal preemption provides that federal law "shall be the supreme Law of the Land." *Simmons*, 732 F.3d at 473 (quoting U.S. Const. art. VI, cl. 2). Of the three types of preemption—express, conflict, and field—

Georgia Power argues that the FPA has been interpreted by the Supreme Court, *see California*, *supra*, to "occupy[] the field of public water use and power generation except for water use rights." *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 630–31 (2012); [Doc. 10, p. 11 (quoting *Simmons*, 732 F.3d at 476)]. Given that power generation has always been a main character of the federal government's interest, it is no surprise that Congress gave FERC the "final authority to establish license conditions [as well as] a broad and paramount federal regulatory role." *California*, 495 U.S. at 499–500; *Fed. Power Comm'n*, 381 U.S. at 98–99. Consistent with other courts to have considered this issue, it is a license's conditions established by this regulatory role that sets the standard of care for the "construction, operation, maintenance, use, repair, or modification" of a hydroelectric generation facility like Oliver Dam. 18 C.F.R. § 12.4(b); *see, e.g.*, *Simmons*, 732 F.3d at 476–77. Given how and where Alex Paxton's death came about, state law cannot set the governing standard of care for Plaintiffs' negligence-based theory of recovery. *City of Lowell v. ENEL N. Am., Inc.*, 796 F. Supp. 2d 225, 231 (D. Mass. 2011) (citation omitted) (holding that a "negligence claim is preempted by the FERC license because [the plaintiff] cannot use state tort law to prevent [the FERC licensee] from doing something that [FERC] has sanctioned").

Plaintiffs vehemently disagree. In short, they are certain that "Georgia tort law applies." [Doc. 23, p. 2]. Relying on *South Carolina Public Health Authority v. F.E.R.C.*, Plaintiffs point out that the FPA "reveals that Congress did not intent to authorize"

FERC "to displace state tort laws applicable to its licensees." 850 F.2d 788, 793 (D.C. Cir. 1988); [Doc. 23, p. 2]. From that, Plaintiffs argue that "[a] FERC license [only] confers upon the holder a right to operate a dam[,]" it does not offer immunity from state tort law. [Doc. 23, p. 3]. While Congress may not have wanted "to oust the States of their traditional authority to determine . . . rules of liability in tort[,]" Georgia certainly intended for that to happen. [*Id.* at p. 2 (quoting *DiLaura v. Power Auth. of N.Y.*, 786 F. Supp. 241, 248 (W.D.N.Y. 1991), *aff'd* 982 F.2d 72 (2d Cir. 1992))].

Georgia enacted legislation known as the Dam Safety Act of 1978. The purpose of Georgia's Dam Safety Act is to "provide for the inspection and permitting of certain dams in order to protect the health, safety, and welfare of all the citizens of the state by reducing the risk of failure of such dams." O.C.G.A. § 12-5-371. However, excluded from "such dams" is "[a]ny dam licensed by the Federal Energy Regulatory Commission." *Id.* at §§ 12-5-371, 372(4)(B)(iii). That's huge. While Congress may not have intended to displace Georgia's tort laws, it's unquestionably clear that Georgia has ceded the issue of dam safety to the federal government for any Georgia-based dams operating pursuant to a FERC license.

Although well put, all of Plaintiffs' arguments within the vein of a preemption issue are supported by cases involving states other than Georgia. *See* [Doc. 23, pp. 5–7]. Georgia's Dam Safety Act simply pulls this case from underneath any of the cases relied upon by Plaintiffs to support their arguments against preemption. Whether a FERC

license operates to preempt state law really isn't even an issue—Georgia did that all on its own. Thus, the standard of care is, as Georgia Power argues, set by what it included—and FERC's Regional Engineer approved—in its Dam Safety Program. Accordingly, Georgia Power has raised a colorable federal defense.

In all, Georgia Power has satisfied all three of the statutory prerequisites to justify its removal of Plaintiffs' case pursuant to federal officer removal jurisdiction under § 1442(a)(1). *Caver*, 845 F.3d at 1142; *Magnin*, 91 F.3d at 1427.

## C.   Federal-Question Jurisdiction

Next, there's the potential basis for federal-question jurisdiction under 28 U.S.C. § 1331. Georgia Power argues that because the substance of Plaintiffs' state-law claims implicates significant federal issues, the Court has jurisdiction under § 1331 as well. [Doc. 10, p. 15]. Relying on the carefully chosen language of their Complaint [Doc. 9-1], Plaintiffs argue that the relief they seek in this case is supplied exclusively by state negligence law and that that any dependence or reliance on "substantial question[s] of federal law" to decide their claims is unnecessary. [Doc. 9, p. 12 (quoting *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 690 (2006))]. When it comes to federal-question jurisdiction, two well-settled notions mentioned above come back into play. *See* Section (B)(3), *supra*.

First, plain and simple, federal questions presented on the face of well-pled complaints invoke federal-question jurisdiction. *Caterpillar Inc. v. Williams*, 482 U.S. 386,

392 (1987). Second, "[a] defense that raises a federal question is inadequate to confer federal jurisdiction." *Mottley*, 211 U.S. 152. For now, only the first one needs discussing: Well-pled complaints allow plaintiffs to be the "master[s] of the[ir] claim[,] and [they] may avoid federal jurisdiction by exclusive reliance on state law." *Id.* Generally speaking, this is why Plaintiffs argue that federal-question jurisdiction isn't appropriate for their case—because the "[u]ltimate resolution" of their "straightforward negligence claims" comes from questions of Georgia law, not federal. [Doc. 9, pp. 12–13].

Notwithstanding Plaintiffs' allegations based purely on state law, federal jurisdiction will lie if "a federal issue is (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258. Where all four of these requirements are met, the Supreme Court has held that federal jurisdiction is proper given the "serious federal interest in claiming the advantages thought to be inherent in a federal forum." *Id.* Let's examine them.

### 1.      Necessarily Raised

For the first requirement, Georgia Power argues that it's met simply because Plaintiffs' tort case isn't like regular, run-of-the-mill tort cases. Regular tort cases are, of course, decided on state law. The difference here, according to Georgia Power, is that the extent of its liability hinges on interpretation of what is required by its FERC license, FERC's rules and regulations, and the FPA. [Doc. 15, p. 3]. In support of this argument,

Georgia Power cites to *Otwell v. Alabama Power Company*, but the Court is inclined to agree with Plaintiffs that *Otwell* doesn't quite fit the bill for the rather nuanced federal-question inquiry presented here. 747 F.3d 1275 (11th Cir. 2014).

In *Otwell*, a group of more than 3,000 property owners and other interested parties affected by the operation of a FERC-licensed dam asserted tort claims against Alabama Power Company because the lowered water levels hindered enjoyment of their property or the lake on which the dam sat. 747 F.3d at 1278–79. The Eleventh Circuit saw those tort claims as nothing more than a collateral attack on FERC's decision to renew Alabama Power's license with no changes to its course of operations. *Id.* at 1278–79, 1281–83. *Otwell*, broadly speaking, dealt with judicial review in the sense that the FPA "vests the federal courts of appeals with exclusive jurisdiction to affirm, modify, or set aside an order" from FERC. *Id.* at 1181 (citing 16 U.S.C. § 825*l*(b)). Although Plaintiffs' case deals with Georgia Power's potential tort-based liability in its operation of Oliver Dam, it may be too tenuous to say that just because it's operated pursuant to a licensed issued by FERC that potential liability, if any, is "inescapably intertwined" with a *review* of one of FERC's final decisions. *Otwell*, 747 F.3d at 1282. It's a thin line to be drawn, for sure, but it's thick enough to have some presence.

What the Court does agree with, though, is Georgia Power's contention that what is required by its FERC license, FERC's rules and regulations, and the FPA supplies Georgia Power's duty of care. *Funderburk v. South Carolina Electric & Gas Co.*,

19

179 F. Supp. 3d 569, 578–79 (D.S.C. 2016). Plaintiffs claim that "Georgia Power owed its contractor's employees . . . a duty of not imperiling their lives[,]" but they don't provide the source of that duty. [Doc. 9-1, ¶ 22]. Of course, Plaintiffs will argue that it ought to be obvious that the "duty" at issue in this case comes from Title 51 of the Official Code of Georgia Annotated, but the "liability" portion of their Complaint (aside from their pleading of attorney's fees and putative damages) doesn't otherwise mention or cite Georgia law at all. [*Id.* at ¶ 44]; *see Funderburk*, 179 F. Supp. 3d at 578. Plaintiffs claim in their Complaint and contend several times throughout their briefs that Georgia Power's failure to follow proper "lockout" or "tagout" procedures caused the perilous situation in which Alex Paxton found himself. *See, e.g.*, [Doc. 9-1, ¶ 24]; [Doc. 23, pp. 10–11]. But that only begs one question: What sets those "lockout" or "tagout" procedures? Plaintiffs, or Georgia Power for that matter, haven't directly said. Plaintiffs don't claim that they're set by Georgia tort law, and frustratingly, Georgia Power hasn't produced anything showing that they're set by its FERC-approved Dam Safety Program.

Something has to provide the governing duty for a negligence claim, but one can never forget that the Georgia General Assembly has *unequivocally said* that the "health, safety, and welfare of all [its] citizens" doesn't fall within the purview of state-law protections when a dam within its borders is licensed by FERC. O.C.G.A. § 12-5-371. With such a clear stance taken by Georgia, the Court simply can't—for purposes of the jurisdictional issues in this case—pretend that Georgia Power's FERC license and

federal governmental regulations that control Georgia Power's operation of Oliver Dam don't exist. *Funderburk*, 179 F. Supp. 3d at 578. Georgia law may provide *a* duty for regular tort cases involving the "health, safety, and welfare of all the citizens of the state," but it doesn't supply one when it comes to injuries that may arise from, occur on, or occur within Georgia-based dams licensed by FERC. *See* O.C.G.A. § 12-5-371. Thus, the existence of Georgia Power's FERC license and federal governmental regulations "necessarily raise" federal issues notwithstanding Plaintiffs' efforts to omit them. *See Franchise Tax Bd. of Cal. v. Const. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 22 (1983).

### 2. Actually Disputed

Courts that have previously decided this requirement make short work of it. *See, e.g.*, *Funderburk*, 179 F. Supp. 3d at 579; *Sherr v. South Carolina Electric & Gas Co.*, 180 F. Supp. 3d 407, 417–18 (D.S.C. 2016); *Carrington v. City of Tacoma, Dep't of Public Utilities, Light Division*, 276 F. Supp. 3d 1035, 1041–42 (W.D. Wash. 2017). Consistent with those courts, Georgia Power argues that the mere dispute over whether Georgia law provides the applicable duty of care or whether the FERC license, FERC's rules and regulations, or the FPA supplies that duty is sufficient to satisfy this second requirement. [Doc. 10, p. 28]. The Court doesn't disagree with the simple and straightforward approach to this second requirement.

3.    **Substantial**

Plaintiffs' argument that federal law isn't actually disputed in their state-law negligence case meshes nicely with Georgia Power's arguments as to whether the federal issues present (but not actually raised in their Complaint) are substantial. First, Plaintiffs, in their efforts to remand this case, argue that the FPA "does not confer exclusive [federal-court] jurisdiction" over what they vigorously push as a purely state-law case. [Doc. 9, p. 12]. Except it does. The jurisdictional provision of the FPA states:

> The District Courts of the United States, and the United States courts of any Territory or other place subject to the jurisdiction of the United States *shall have exclusive jurisdiction* of violations of this chapter or the rules, regulations, and orders thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by, or to enjoin any violation of, this chapter or any rule, regulation, or order thereunder.

16 U.S.C. § 825p (emphasis added).

Plaintiffs contend that Congress, in a very real sense, "intended [the FPA] . . . to preserve existing state laws governing the damage liability of its licensees[.]" [Doc. 23, p. 3 (quoting *Skokomish Indian Tribe v. United States*, 410 F.3d 506, 519 (9th Cir. 2005))]. That may very well be true. There may be avenues provided by state law that can remedy accidents that occur in or on dams licensed by FERC. In that regard, some federal courts *do* have the ability to apply state law in cases for injuries involving a FERC-licensed dam, but not the ones in Georgia. For better or worse, Georgia has chosen to prevent the application of its own tort laws and place the onus on federal law to supply Plaintiffs' avenue to recovery. As eyebrow-raising as it seems, it makes a huge

difference that the incident in this case happened inside a FERC-licensed dam located *in Georgia*.

With respect to whether a federal issue has a substantial presence, something greater than "mere presence of a federal issue in a state cause of action" is needed to "automatically confer federal-question jurisdiction." *Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 813 (1986). This brings the Court back to the second well-settled notion mentioned above. A defense that raises a federal question is inadequate to confer federal jurisdiction, and a case is only properly removed when it could have originally been brought in federal court. *Id.* at 808 (first citing *Mottley*, 211 U.S. at 152 and then citing 28 U.S.C. § 1441(b)). Whether Georgia Power's FERC license, FERC's rules and regulations, and the FPA are "tangentially relevant" or—as it seems—relevant to much greater degree than Plaintiffs anticipated when they filed their Complaint, it's certainly probable that Georgia Power isn't raising these various aspects of federal law in defense of Plaintiffs' claims. [Doc. 9, p. 12]. Just as easy, Georgia Power may simply be saying that Plaintiffs' cause of action must necessarily arise *under federal law* since Georgia's Dam Safety Act makes it pretty concrete that they can't recover under Georgia's tort laws. *See Mottley*, 211 U.S. at 152.

However, when a case invites opportunity for a potential upset of any congressionally approved balance of federal and state judicial responsibilities, there must always be an assessment of whether a federal forum disrupts that balance. *Grable*

*& Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005) (citing *Merrell Dow*, 478 U.S. at 810). Unfortunately, there is no "'single, precise, all-embracing' test for jurisdiction over federal issues embedded in [a] state-law [case][,]" but federal issues "will ultimately qualify for a federal forum only if federal jurisdiction is consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of § 1331." *Grable*, 545 U.S. at 313–14.

To that end, Plaintiffs assert that the federal government's interest in this case is limited because its resolution does not interrupt the development of water power or the federal system of energy regulation. [Doc. 9, p. 13]. Perhaps not. But as the issuer of the license that controls the "operation, maintenance, use, repair, or modification" of Oliver Dam, the federal government certainly has an interest in preventing dissimilar standards of care to govern possible liability on behalf of its licensees. 18 C.F.R. § 12.4(b)(2)(iv). This is especially true when a dam—like Oliver Dam—sits on the border of two separate states.

To find that state law ought to govern Plaintiffs' claims in this case could bring about two different outcomes: a "win" under Alabama law, perhaps, and a "loss" under Georgia law, or vice versa. Although allowing this case to be adjudicated in federal court may not hinder the production or development of water power, the Supreme Court has already recognized that without federal regulations "uses of the [n]ation's water resources . . . might well be contradictory rather than harmonious." *Fed. Power*

*Comm'n*, 381 U.S. at 98. The use of Georgia Power's FERC license, FERC's rules and regulations, and the FPA to govern cases like Plaintiffs' avoids any chance that different jurisdictions may apply dissimilar standards by which privately-owned, FERC-licensed dams could be held. Thus, removal of this case from state court to federal doesn't upset the "congressionally approved balance of federal and state judicial responsibilities[,]" it helps maintain it. *Grable*, 545 U.S. at 314.

That said, the Court doesn't disagree with Plaintiffs' position that "the state court is competent to interpret and apply federal law," but interpretation of the FPA as well as what is required by Georgia Power's FERC license and FERC's regulations "sensibly belongs" in federal court. *VA Timberline, LLC v. Appalachian Power Co.*, No: Civ.A. 4:06-CV-00026, 2006 WL 1993557, at *2 (W.D. Va. July 13, 2006) (quoting *Grable*, 545 U.S. at 315). Subjection to a federal forum for liability that may potentially flow from the facts of this case allows federal courts to apply federal standards and federal regulations that are developed by federal agencies or derived from federal statutes passed by Congress. Suffice it to say, the federal issues presented "behind the scenes" in Plaintiffs' Complaint are or will be substantial in determining the duty of care that Georgia Power owed to Alex Paxton. Accordingly, the third requirement for determining whether jurisdiction under § 1331 is appropriate is met.

### 4.    Capable of Federal-Court Resolution

Federal jurisdiction over a state-law claim will only lie if the federal issues in play are "capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258. Briefly discussed above, this determination requires the Court to consider whether exercising jurisdiction would "herald an enormous shift of traditionally state cases into federal courts." *Grable*, 545 U.S. at 319. In short, it doesn't. The underlying facts of this case—namely, the location of where those underlying facts developed—simply makes tort cases like this one different. Different in that the specific location of the incident—literally inside of a FERC-licensed dam—underscores the Supreme Court's guidance that the category of cases with "origins in state rather than federal law" but capable of resolution by a federal court is a "special and small category[.]" *Gunn*, 568 U.S. at 258. This case's undoubtedly unique fact pattern puts it squarely within this category.

Since all four of the requirements are met, jurisdiction under § 1331 is likewise appropriate for this case. A federal court can interpret the FPA and the FERC license issued to Georgia Power (along with its accompanying rules and regulations) when considering Plaintiffs' particular negligence claims without disrupting Congress's intended division of labor between state and federal courts. *Id.* An application of state law to set the duty of care for the "construction, operation, maintenance, use, repair, or modification" of a dam licensed by FERC "would stand as an obstacle to the

accomplishment and execution of the full purposes and objectives' of the FPA." 18 C.F.R. § 12.4(b); *Simmons*, 732 F.3d at 477 (alteration adopted).

### D.   <u>Admiralty Jurisdiction</u>

Concluding that the Court has subject-matter jurisdiction under two of the three bases asserted by Georgia Power—federal officer jurisdiction and federal-question jurisdiction—leaves only a decision about admiralty jurisdiction.

The Constitution also extends federal judicial power "to all [c]ases of admiralty and maritime [j]urisdiction[,]" and district courts "have original jurisdiction, exclusive of the courts of the States, of . . . [a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled." *Sea Vessel, Inc. v. Reyes*, 23 F.3d 345, 348 (11th Cir. 1994); U.S. Const. Art. III, § 2, cl. 1; 28 U.S.C. § 1333. When admiralty jurisdiction is properly invoked, a uniform body of federal maritime law applies to protect commercial activity by ensuring that uniform rules of conduct are in place. *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 206 (1996) ("With admiralty jurisdiction . . . comes the application of substantive maritime law."); *Exec. Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 269–70 (1972). On top of that, unlike the previously discussed jurisdictional bases, there is the general rule that

claims in admiralty are to be tried without a jury.[6] *St. Paul Fire and Marine Ins. Co. v. Lago Canyon, Inc.*, 561 F.3d 1181, 1187 (11th Cir. 2009) (citing *Harrison v. Flota Mercante Grancolombiana, S.A.*, 577 F.2d 968, 974 (5th Cir. 1978)).

The Eleventh Circuit unquestionably recognizes the binding precedent and admittedly expansive effect that the old Fifth Circuit's test for admiralty-jurisdiction questions created in *Richardson v. Foremost Insurance Company*, 641 F.2d 314 (5th Cir. Apr. 1981), and subsequently affirmed by the Supreme Court in *Foremost Insurance Company v. Richardson*, 457 U.S. 668 (1982). *Aqua Log, Inc. v. Lost and Abandoned Pre-Cut Logs and Rafts of Logs*, 709 F.3d 1055, 1059, 1061 (11th Cir. 2013). In *Richardson*, the old Fifth Circuit "noted that for admiralty jurisdiction to exist in a tort case, two requirements must be met: (1) there must be a significant relationship between the alleged wrong and traditional maritime activity (the nexus requirement) and (2) the tort must have occurred on navigable waters (the location requirement)." *Aqua Log*, 709 F.3d at 1059 (citing *Richardson*, 641 F.2d at 315). Let's tackle the "location requirement" first. Like many cases before it, the locality of the alleged tortious wrong here presents another one of those "perverse and casuistic borderline situations that have demonstrated some of the problems" with the "location requirement." *Exec. Jet Aviation*,

---

[6] If a pleading shows that admiralty and some other basis of subject-matter jurisdiction exists, Federal Rule of Civil Procedure 9(h) allows a plaintiff to "elect to proceed in admiralty . . . rather than under" the other jurisdictional basis and strip a defendant's ability to exercise the right to a trial by jury. *St. Paul Fire*, 561 F.3d at 1187 (citing Fed. R. Civ. P. 9(h)).

409 U.S. at 255.

### 1.    Navigable Waters (The "Location Requirement")

Easily stated but murky to discern, "the waterway must be navigable." *Aqua Log*, 709 F.3d at 1060. Georgia Power argues that for purposes of admiralty jurisdiction, "'[i]f the waterway is capable of being used in commerce, that is a sufficient threshold' to conclude that it is navigable for admiralty-jurisdiction purposes." [Doc. 10, p. 12 (quoting *Aqua Log*, 709 F.3d at 1062) (emphasis omitted)]. Georgia Power stresses that the word "capable" doesn't hinge on whether there is *current* commerce around Oliver Dam. [Doc. 10, p. 12 (quoting *Tundidor v. Miami-Dade Cnty.*, 831 F.3d 1328, 1333–34 (11th Cir. 2016))]; *see also* [Doc. 9, p. 5]. In other words, Georgia Power argues that just because a body of water isn't currently being used for commercial navigation doesn't mean it's not navigable. *See Price v. Price*, 929 F.2d 131, 135 (4th Cir. 1991).

To support its arguments that Plaintiffs' injury took place on navigable waters, Georgia Power points out that Oliver Dam was created "for improving and developing a waterway or waterways for the use or benefit of interstate and foreign commerce, for the improvement and utilization of water power development, and for other beneficial public purposes, including recreational purposes." [Doc. 10, p. 12 (quoting 21 F.P.C. at 303)]. Although the Chattahoochee River, along which Oliver Dam sits, may not be "a continuously navigable waterway," Lake Oliver, in Columbus, Georgia, may qualify as a navigable body of water notwithstanding Plaintiffs' argument that "Oliver Dam

prevents vessels of any kind from travelling along the . . . [r]iver." *See In re Stephens*, 341 F. Supp. 1404, 1405 n.1 (N.D. Ga. 1965) (finding that portions of the Chattahoochee River are not navigable until Columbus, Georgia); [Doc. 9, p. 6].

Plaintiffs rely on *Seymour v. United States*, 744 F. Supp. 1161, 1164 (S.D. Ga. 1990), and urge the Court to adopt a sister district court's holding that "a lake was not navigable because there was a lack of current commercial activity on [it]." [*Id.*]. However, as Georgia Power points out, binding Eleventh Circuit opinions confirm that waterways only have to be "capable" of supporting commerce in order to be classified as navigable. *Aqua Log*, 709 F.3d at 1062; *Tundidor*, 831 F.3d at 1331. Thus, the fact that there may not be any current commercial activity on Lake Oliver or at Oliver Dam can't summarily thwart Georgia Power's efforts to invoke the Court's admiralty jurisdiction. *See Aqua Log*, 709 F.3d at 1061 (explaining that admiralty jurisdiction extends to waterways where there is no current commerce but the waterways are capable of supporting commerce because they "create[] a climate conducive to commercial maritime activity").

In *Tundidor*, though, the Eleventh Circuit agreed with the Ninth Circuit that "if the damming of a [waterway] has the practical effect of eliminating commercial maritime activity, no federal interest is served by the exercise of admiralty jurisdiction over the events transpiring on that body of water, whether or not it was originally navigable." 831 F.3d at 1332 (quoting *Adams v. Montana Power Co.*, 528 F.2d 437, 440–41

(9th Cir. 1975)). This begs the question, did Alex Paxton dive into a section of Oliver Dam that held non-navigable water (like a reservoir of sorts) or does that even matter since water passing through the dam itself is capable of supporting commercial activity? Even with all of the questions raised by this unique case, the real crux for the admiralty-jurisdiction inquiry is whether the water passing through Oliver Dam is "capable of transporting *commercial* vessels[]" because "extending jurisdiction to waters incapable of commercial activity serves no purpose of admiralty jurisdiction."[7] *Tundidor*, 831 F.3d at 1332–33 (emphasis added). To be clear, it's not the dam that has to be capable of supporting commercial activity, it's the water that passes through it.

Truthfully, when it comes to the infrastructure of Oliver Dam, the exact location on the dam where Alex Paxton descended into the water, or how water passes through it the parties have given the Court little to nothing to work with. The Court would have greatly preferred the parties to have supplied it with more to consider given the nuanced and tangled jurisdictional inquiries in this case. The near-empty record before the Court has made its determinations that much more difficult.

Nevertheless, Georgia Power contends that "Oliver Dam was constructed in a manner making it capable of supporting interstate commerce." [Doc. 10, p. 13]. In fact, as Georgia Power points out, its FERC license clearly didn't have the effect of

---

[7] "The purpose behind the grant of admiralty jurisdiction was the protection and the promotion of the maritime shipping industry through the development and application, by neutral federal courts, of a uniform and specialized body of federal law." *Tundidor*, 831 F.3d at 1333 (quoting *Adams*, 528 F.2d at 439).

eliminating commercial activity. *See Tundidor*, 831 F.3d at 1332. The license specifically required Oliver Dam to "be designed to permit the construction of locks thereat, if the interests of navigation so demand" and required Georgia Power to "furnish rights-of-way for such facilities and water in such amounts as may be necessary for navigation." 21 F.P.C. at 301. What's more, one of the affidavits supplied by Georgia Power states that "Oliver Dam is located on the part of the Chattahoochee River that is used for a variety of maritime commercial activities, including private marinas and fuel stations." *See Lawrence*, 919 F.2d at 1528–29 (noting that a court may consider an affidavit on a factual challenge of subject-matter jurisdiction); [Doc. 10-1, DeShazo Aff., ¶ 7]. Based on these limited points to consider, it appears (under Eleventh Circuit precedent) that the injury alleged in Plaintiffs' Complaint occurred on navigable waters.

However, with respect to the "location requirement," Plaintiffs point the Court to *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, where the Second Circuit looks to "where 'the substance and consummation of the injury' took place[]"—a seemingly different approach than the Eleventh Circuit's "capable of supporting commercial activity" approach. *Tandon*, 752 F.3d 239, 244–45 (2d Cir 2014); *Aqua Log*, 709 F.3d at 1062. This brings the Court to Plaintiffs' argument concerning the all-important fact that the injury happened "*inside* . . . Oliver Dam, [and] not on any [actual] waterway." [Doc. 9, p. 5].

In *Tandon*, the Second Circuit observed that when some structures are in a

permanently fixed location and connected to the ground underneath water, injuries that occur on them do not invoke admiralty jurisdiction. 752 F.3d at 248 (first quoting *The Blackheath*, 195 U.S. 361, 367 (1904) and then quoting *Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 493–94 (2005)). While the location of the injury in this case is, as the Court alluded earlier, "murky," the Court isn't completely in the dark. The Supreme Court has held that there was no admiralty jurisdiction where "a longshoreman unloading a vessel was standing on the pier when he was struck by a . . . sling from [a] ship and knocked into the water where he was later found dead." *Exec. Jet Aviation*, 409 U.S. at 255 (discussing *Smith & Son v. Taylor*, 276 U.S. 179 (1928)). Why? "[B]ecause the blow by the sling was what gave rise to the cause of action, and it took effect on the land." *Exec. Jet Aviation*, 409 U.S. at 255.

Here, as a commercial diver, Alex Paxton may have started out "on the land" (somewhere on Oliver Dam) but his cause of action didn't arise until he "encountered a hole in the dam's face." *Id.*; [Doc. 9-1, ¶¶ 10, 12]. At that point, Alex Paxton was under the water. Alex Paxton's initial descent down a ladder into the water was a regular day at work for him—no cause of action arising. [Doc. 20, Transcript of Proceedings, p. 36:17–18]. It wasn't until some point after Alex Paxton's descent underwater that his

cause of action arose.[8] Thus, logic dictates that because Alex Paxton was "underwater" when "his left arm was . . . sucked into the hole and pipe up to his shoulder[,]" it seems that it would yield no difference to consider the permanently fixed location of Oliver Dam. [Doc. 9-1, ¶ 12]. Although *within* the confines of the dam, Alex Paxton's death occurred underneath waters that pass through it and, according to Georgia Power's FERC license, Oliver Dam has to supply "water in such amounts as may be necessary for navigation." [Doc. 20, Transcript of Proceedings, p. 36:16–17]; 21 F.P.C. at 301.

Of course, docks and once-floating vessels now moored to land invite considerable distinctions for a case concerning an injury sustained inside a federally licensed commercial hydroelectric generation facility, but they have no reason to be drawn given where Alex Paxton's cause of action arose: underwater. Bottom line, because we know (from Plaintiffs' own allegations) that Alex Paxton's cause of action arose underwater, it may be an exercise in futility to, at this time, venture beyond what the Eleventh Circuit currently requires for determining the "location requirement"— whether the tort occurred on what it delegates as navigable waters. *Aqua Log*, 709 F.3d at 1059 (citing *Richardson*, 641 F.2d at 315). In other words, the permanently fixed location of Oliver Dam has no bearing on the jurisdictional issue before the Court

---

[8] Plaintiffs may argue that Georgia Power was already negligent when its "employees failed to follow the proper practice and procedures to 'lockout' or 'tagout' the dam equipment" which led to Alex Paxton's death. [Doc. 9-1, ¶ 23]. Although proper "lockout" or "tagout" procedures may not have been followed *on land* that only goes to duty, breach, and causation. One element remains to sustain a negligence claim— harm. Alex Paxton's harm didn't befall him while he was on land. Alex Paxton's harm occurred when he was "underwater" and "encountered [the] hole in the dam's face." [*Id.* at ¶ 12].

because Alex Paxton's injury occurred under navigable waters. If "capable of . . . use[] in commerce" sets the rule for determining navigability, and in the Eleventh Circuit, it does, then the cause of action for this case arose—not even on navigable waters—but in them. *Aqua Log*, 709 F.3d at 1059, 1062. Even assuming the "location requirement" is met,[9] admiralty jurisdiction cannot attach in this case because Georgia Power has not met its burden of showing the Court that the "nexus requirement" is also met. *Conn. State Dental Ass'n*, 591 F.3d at 1343 (the removing party bears the burden of showing the existence of federal subject[-]matter jurisdiction).

### 2.   Connected With Maritime Activity

The "nexus requirement" means that there must be a significant relationship between the alleged wrong and traditional maritime activity. *Aqua Log*, 709 F.3d at 1059 (citing *Richardson*, 641 F.2d at 315). The "nexus requirement" is met "if, on an assessment of the general features of the type of incident involved, it has 'a potentially disruptive impact on maritime commerce,' *and* 'the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Caron v. NCL (Bahamas), Ltd.*, 910 F.3d 1359, 1365 (11th Cir. 2018) (quoting *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995))

---

[9] Hypothetically speaking, if Alex Paxton descended into a large container, reservoir, or pool of water within Oliver Dam, the Court's analysis would likely change. Again though, the parties provided the Court with so little, the hypothetical "What Ifs" brought about by the underlying facts of this case only continue to grow.

(emphasis added).

a.   <u>Disruptive Impact on Maritime Activity</u>

Here, Plaintiffs and Georgia Power agree on at least one thing—"the activity giving rise to the incident" involves a commercial diver drowning while making repairs inside a hydroelectric dam licensed by the federal government. [Doc. 9, p. 7]; [Doc. 10, p. 14]. However, they disagree as to whether the drowning had "the potential to disrupt maritime commerce." *Grubart*, 513 U.S. at 538. Disruption, for this inquiry, focuses on the potential effects—an intermediate level of possible generality—as opposed to the "particular facts of the incident[.]" *Id.* Put simply, the Court's inquiry for the "disruptive impact" component looks to whether the drowning could be seen within a class of incidents that pose "more than a fanciful risk to commercial shipping." *Id.* at 539.

Obviously, Plaintiffs argue that "[n]othing about the incident posed any risk" to commercial activity because "[t]here were, and are, no commercial [vessels] operating in the interior of Oliver Dam." [Doc. 9, pp. 7–8]. Of course, Georgia Power steers the Court in a different direction, telling it that "Oliver Dam is located on the part of the Chattahoochee River that is used for a variety of maritime commercial activities, including private marinas and fuel stations." [Doc. 10-1, DeShazo Aff., ¶ 7]. But to what extent? To Plaintiffs' point, there lies a critical distinction between what the Eleventh Circuit requires for the "location requirement" and what is examined for the "nexus

requirement." We already know that whether a waterway is navigable depends on its capability of supporting commercial activity. *Aqua Log*, 709 F.3d at 1059, 1062. However, whether something is capable of supporting something is totally different than whether that capability has the potential to be disrupted. If, as Plaintiffs argue, there isn't any commercial activity on Lake Oliver (notwithstanding the capability of the water that passes through Oliver Dam to support it) then what potential is there for it to be disrupted? Again, aside from Georgia Power's blanket statement that the area of Lake Oliver at issue (the area around Oliver Dam) "is used for a variety of maritime commercial activities, including private marinas and fuel stations[,]" there is nothing in the record to indicate how often these activities occur.

Regardless of whether there's some amount of commercial maritime activity on Lake Oliver and regardless of whether Oliver Dam is equipped with mechanisms like locks threat rendering it capable of supporting commercial activity "for the purpose of improving and developing a waterway for use in interstate commerce," Georgia Power's own documentation doesn't show that Alex Paxton's death disrupted, or had the potential to disrupt, Lake Oliver's commercial activity in any way. [Doc. 10, p. 14 (citing 21 F.P.C. at 302–03)]; 21 F.P.C. at 301. Rest assured, the Court recognizes the *potential* for maritime commercial activity on Lake Oliver and the fact that Georgia Power's FERC license obligates it "to record the operational and maintenance history of Oliver Dam," including "complete or partial shut-downs[,]" but there is nothing on the

record showing that the incident had the potential to effect those activities. [Doc. 10-1, DeShazo Aff., ¶ 7]; [Doc. 10-2, O'Mara Aff., ¶ 9]; [Doc. 10-3, Barber Aff., ¶ 7]. Yes, Georgia Power may have submitted reports about the incident, but there is nothing indicating that it caused or even had the potential to cause "suspension of project operations." *See, e.g.*, [Doc. 10-3, Barber Aff., ¶ 7]. Although very little is contained in them, Georgia Power did file some of its post-incident documents for the Court to consider. However, none of the documents that are currently on the record discussing Georgia Power's account of the incident to the FERC Regional Engineer even hint that it could have potentially halted the use of Oliver Dam or the surrounding water for commercial activity. Sure, Georgia Power may have investigated the incident, but its filings are otherwise silent to support a conclusion that Alex Paxton's death had any potential effect on maritime activity. [Doc. 10-3, p. 8]. If, in fact, Georgia Power suspended project operations causing Oliver Dam to—even for the smallest amount of time—cease the production of hydroelectric power, that might've been "[o]ther relevant information" Georgia Power needed to communicate to FERC's Regional Engineer. [*Id.*]. And, if that did happen and if such documentation exists, then Georgia Power should've certainly provided it to the Court because it directly applies to jurisdictional determination it's asking the Court to make.

There is no doubt that the incident in this case was disruptive in many forms, but based on what is available to the Court on this record for its determination of whether it

has admiralty jurisdiction, there is little question that, although tragic, Alex Paxton's death does not constitute the kind of incident that poses "more than a fanciful risk to commercial [activity]." *Grubart*, 513 U.S. at 539.

b.    <u>Substantial Relationship to Maritime Activity</u>

With regards to the second requirement to determine whether a case is connected with maritime activity to support an exercise of admiralty jurisdiction, the Supreme Court has already characterized "repair and maintenance work" performed on a navigable waterway on a vessel or barge as "activity . . . substantially related to traditional maritime activity." *Id.* at 540. Here, the incident involved a commercial diver "performing maintenance work . . . so Oliver Dam could function properly." [Doc. 10, p. 14]. Thus, the activity involved in the incident in this case is substantially related to maritime activity.

However, the two aspects required by the Supreme Court and the Eleventh Circuit for the "nexus requirement"—disruptive impact and substantial relationship on maritime activity—are joined by a conjunctive "and," not "or." *Grubart*, 513 U.S. at 534; *Caron*, 910 F.3d at 1365. Although discussed in the arena of a criminal case involving statutory interpretation, the Eleventh Circuit recently held in an en banc opinion that "when 'and' is used to connect a list of requirements, the word ordinarily has a 'conjunctive' sense, meaning that all the requirements must be met." *United States v. Garcon*, --- F. 4th ----, 2022 WL 17479829, at *2 (11th Cir. Dec. 6, 2022). Because "and"

means "and," Georgia Power's inability to demonstrate that the incident in this case satisfies *both* aspects of the "nexus requirement" means that it has failed to meet its burden of showing the existence of admiralty jurisdiction. *Conn. State Dental Ass'n*, 591 F.3d at 1343 (the removing party bears the burden of showing the existence of federal subject[-]matter jurisdiction).

### E.   <u>Plaintiffs' Motion for a Certificate for Interlocutory Review</u>

Relying on 28 U.S.C. § 1292(b), Plaintiffs ask the Court to enter an order permitting interlocutory review of the foregoing rulings on the Court's subject-matter jurisdiction in this case. [Doc. 23, p. 11]. When a district judge is of the opinion that a ruling in a civil action that is normally not appealable but "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation[,]" that judge may certify an appeal. *McFarlin v. Conseco Servs., LLC,* 381 F.3d 1251, 1253 (11th Cir. 2004). From this, the Eleventh Circuit extracts three questions: "(1) What is a controlling question of law?; (2) what is a substantial ground for difference of opinion?; and (3) what does it mean for an appeal to materially advance the ultimate termination of the litigation?" *Id.* at 1257. As the party seeking an interlocutory appeal, the burden is on Plaintiffs to establish each of those elements. *Id.* at 1263–64.

Now, before turning to whether Plaintiffs meet their burden, the Court pauses to

40

note that the Eleventh Circuit—with an eye towards preventing piecemeal litigation—has for some time now, stressed that "§ 1292(b) sets a high threshold for certification" and that although granted by district courts, "[m]ost interlocutory orders do not meet" that high threshold. *OFS Fitel, LLC v. Epstein, Becker & Green, P.C.*, 549 F.3d 1344, 1359 (11th Cir. 2008). Thus, certification is only proper "in exceptional cases where decisions of the appeal may avoid protracted and expensive litigation, . . . where a question which would be dispositive of the litigation is raised[,] and [where] there is serious doubt as to how it should be decided." *McFarlin*, 381 F.3d at 1256. With that in mind, the Court turns to Plaintiffs' efforts to meet the high burden for obtaining interlocutory review.

### 1.    Controlling Question of Law

First, a "controlling question of law" for § 1292(b) purposes refers "to a question of the meaning of a statutory or constitutional provision, regulation, or common law doctrine." *McFarlin*, 381 F.3d at 1258. If the appellate court has to "root[] through the record" to find the answer to the "question of law," interlocutory review isn't warranted. *Id.*; *see also Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1252–53 (11th Cir. 2003). But, where the "question of law" is "one of 'pure' law," in which the appellate court "can decide quickly and cleanly without having to study the record[,]" review may be had. *McFarlin*, 381 F.3d at 1258.

Aside from arguing that the Court's determinations regarding federal officer jurisdiction present "questions on law," Plaintiffs provide nothing else when it comes

detailing what "controlling question [or questions] of law" it wants the Court to certify. [Doc. 23, p. 1]. Notwithstanding this omission and the Court's opinion that this record is uncharacteristically thin for the unique issues before it, there is no doubt that the Court of Appeals would have very little to wade through in answering whatever questions would be certified. Even though the Court could readily deduce the jurisdiction-based questions of law Plaintiffs need certified, there is no need for the Court to hypothesize in writing what those questions might be because Plaintiffs do not satisfy the remaining two requirements to obtain interlocutory review. While the controlling questions of law may be apparent from Court's lengthy analysis and ultimate jurisdictional determinations above, § 1292(b)'s "standard is conjunctive, meaning that if any [requirements] are not satisfied, the Court must deny interlocutory review." *Havana Docks Corp. v. Carnival Corp.*, Lead Case No. 19-cv-21724 BLOOM/MCALILEY, 2022 WL 1522007, at *2 (S.D. Fla. May 13, 2022) (citation omitted).

## 2.    Substantial Grounds for Difference of Opinion

With respect to § 1292(b)'s second requirement, Plaintiffs offer a little more but not nearly enough. They posit that "the Court is well-familiar with the parties' differences of opinion from the briefing[.]" [Doc. 23, p. 1]. However, the parties' difference of opinion isn't the relevant inquiry. To show the existence of a substantial ground for difference of opinion, Plaintiffs must show that "a legal issue is (1) difficult and of first impression, (2) the district courts of the controlling circuit are split as to the

issue, or (3) the circuits are split on the issue." *Consumer Fin. Prot. Bureau*, 165 F. Supp.

3d at 1335. Here, there's no denying that the legal issues presented in this case are

difficult. *Id.* (citing *Rindfleisch v. Gentiva Health Servs.*, 24 F. Supp. 3d 1234, 1239 n.5 (N.D.

Ga. 2013) (denying certification of issue that "has never been decided[]")). Persuasive

case law, however, is clear that although a controlling question of law may be one of

first impression, that is not, without more, sufficient to establish that a substantial

ground for difference of opinion exists because "the district judge has the obligation to

analyze the strength of the arguments in opposition to the challenged ruling when

deciding whether to certify." *Consumer Fin. Prot. Bureau*, 165 F. Supp. 3d at 1335 (first

quoting *In re Flor*, 79 F.3d 281, 284 (2d. Cir. 1996) and then quoting *Couch v. Telescope,*

*Inc.*, 611 F.3d 629, 634 (9th Cir. 2010)); *see also Ibrahim v. FINR III, LLC*, No. 8:15-cv-1093-

T-17, 2016 WL 409630, at *3 (M.D. Fla. Feb. 3, 2016) ("[M]erely showing that the order

for which appeal is sought presents a difficult ruling, or demonstrating a lack of

authority on the legal issue, is not sufficient.").

Despite Plaintiffs offering more when it comes to § 1292(b)'s second element,

their overarching concerns (that arose because of the Court's previous Order) regarding

a lack of congressional intent to upheave and displace traditional state tort laws were

carefully considered and addressed above. *See* Sections (B)(3) & (C)(3), *supra*. This case

may present an issue of first impression, but Plaintiffs' efforts to secure interlocutory

review do not point out or specifically address any inter-district split or any inter-circuit

split relative to the issues. *Consumer Fin. Prot. Bureau*, 165 F. Supp. 3d at 1335. Although

Plaintiffs cite to several out-of-circuit cases to support their positions regarding federal

officer jurisdiction, none of those cases dealt with the implications or the effects that

Georgia's Dam Safety Act has on traditional negligence cases that occur during the

maintenance of a Georgia-based FERC-licensed dam. *See id.*; O.C.G.A. § 12-5-371; [Doc.

23, pp. 2–11]. On top of that, the most glaring difference between two circuits is the

Eleventh Circuit and the Second Circuit's approach to the "location requirement" for

determining navigability for admiralty-jurisdiction purposes. *See* Section (D)(1), *supra*.

But again, that difference was ironed out applying Eleventh Circuit case law.

Plaintiffs' arguments, they admit, are geared more towards their efforts to have

the Court reconsider its previous ruling on federal officer jurisdiction as opposed to

arguments for obtaining interlocutory review. [Doc. 23, p. 11]. For this reason, the Court

concludes that Plaintiffs—aside from noting the difference between their own opinion,

the Court's, and Georgia Power's—have not shown that substantial grounds for

difference of opinion exists to warrant interlocutory review. "Neither the mere lack of

authority on the issue nor the claim that the district court's ruling is incorrect

constitutes a substantial ground for difference of opinion." *Flint Riverkeeper, Inc. v. S.*

*Mills, Inc.*, 261 F. Supp. 3d 1345, 1347 (M.D. Ga. 2017). Therefore, like many district

courts to make § 1292(b) determinations, "this Court remains unconvinced that

[Plaintiffs are able to] demonstrate a substantial ground for difference of opinion

sufficient to overcome the high threshold of § 1292(b)." *Havana Docks Corp.*, 2022 WL

1522007, at *4.

### 3.   Materially Advance the Ultimate Termination of the Litigation

"Finally, the text of § 1292(b) requires that resolution of a 'controlling question of

law . . . may materially advance the ultimate termination of the litigation.'" *Id.* at 1259

(quoting 28 U.S.C. § 1292(b)). Easy enough to understand, this requirement means "that

resolution of a controlling legal question would serve to avoid a trial or otherwise

substantially shorten the litigation." *McFarlin*, 381 F.3d at 1259 (citation omitted).

On this element, the Court undoubtedly understands Plaintiffs' positions as to

how appellate-court review at this juncture could terminate this matter entirely in

federal court. [Doc. 23, p. 2]. However, in their efforts to have the Court reconsider its

previous determination for federal officer jurisdiction, Plaintiffs misplaced the true

inquiry and cut short their efforts in meeting what § 1292(b) requires. [*Id.* at pp. 1, 11

(noting "the parties' differences of opinion" and that Plaintiffs "really . . . would prefer"

reconsideration)]. When the Court measures the weight of Plaintiffs' opposing

arguments to its disputed rulings on federal officer jurisdiction, there simply isn't

enough to push Plaintiffs over the markedly high standard required for § 1292(b)

review. *Havana Docks Corp.*, 2022 WL 1522007, at *4. To say that the questions raised by

the subject-matter jurisdiction inquiries in this case are not intricate, difficult, or niche

would be a gross misstatement, but the Court simply doesn't believe they meet the high

threshold of § 1292(b).[10] Accordingly, the Court **DENIES** Plaintiffs' Motion for a Certificate for Interlocutory Review [Doc. 23].

### F.      <u>Conclusion</u>

Having ruled on the two remining jurisdictional issues before it, the Court **VACATES** and **WITHDRAWS** its previous Order Denying Plaintiffs' Motion to Remand [Doc. 21] dated October 3, 2022. Consistent with the Court's discussion above, it **GRANTS in part** and **DENIES in part** Plaintiff's Motion to Remand [Doc. 21]. Specifically, with respect to Plaintiffs' efforts to remand this case because the Court lacks admiralty jurisdiction under 28 U.S.C. § 1333, their motion is **GRANTED**. As for their efforts to remand this case because the Court lacks federal officer jurisdiction under 28 U.S.C. § 1442 or federal-question jurisdiction under 28 U.S.C. § 1331, their motion is **DENIED**. Lastly, the Court **DENIES** Plaintiffs' Motion for a Certificate for Interlocutory Review [Doc. 23], and it **DENIES** their Motion for Reconsideration [Doc. 23] related to the Court's previous ruling regarding federal officer jurisdiction under 28 U.S.C. § 1442.

**SO ORDERED**, this 21st day of December, 2022.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**

---

[10] As a final remark, the Court mentioned to the parties that it would prefer to certify this case for interlocutory review. However, after researching the applicable law, it's clear that the Court's preference must yield to the Circuit's precedent regarding the quiet heavy burden a party must successfully carry on the question of interlocutory review.