**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**COLUMBUS DIVISION**

| | |
|---|---|
| **KENNETH PAXTON,** *as Next Friend of Alex Reed Paxton, deceased;* **and KATHRYN HARTLEY,** *as Next Friend of Alex Reed Paxton, deceased, and as Administrator of the Estate of Alex Reed Paxton,* <br><br> *Plaintiffs,* <br><br> **v.** <br><br> **GEORGIA POWER COMPANY,** <br><br> *Defendant and Third-Party Plaintiff,* <br><br> **v.** <br><br> **GLENN INDUSTRIAL GROUP, LLC,** <br><br> *Third-Party Defendant.* | **CIVIL ACTION NO.** <br> **4:22-cv-00081-TES** |

**ORDER**

On October 27, 2020, while inspecting a headgate's chain on Georgia Power Company's Oliver Dam, Alex Paxton, a commercial diver employed by Glenn Industrial Group, LLC, died. This lawsuit arises from his death. After Plaintiffs Kenneth Paxton and Kathryn Hartley filed suit against Georgia Power, Georgia Power requested Glenn Industrial to honor its indemnity obligations, but Glenn Industrial refused to do so. [Doc. 61-1, ¶ 47]; [Doc. 61-5]; [Doc. 61-6]. In mid-2023, Plaintiffs, Georgia Power, and Glenn Industrial settled all claims in this matter except one. Left unresolved is whether

the indemnification provision of Glenn Industrial and Georgia Power's Master Agreement governing maintenance of Oliver Dam applied to the work Glenn Industrial performed on October 27, 2020. That is, does Glenn Industrial have to reimburse Georgia Power for any settlement paid to Plaintiffs? Georgia Power and Glenn Industrial have cross-moved for summary judgment on the remaining contractual indemnity claim that Georgia Power asserts against Glenn Industrial via its Third-Party Complaint [Doc. 5]. [Doc. 5, p. 6 ¶¶ 24–32]; [Doc. 61-1, ¶ 49].

To quickly square their positions: Georgia Power contends that the work Glenn Industrial performed on October 27, 2020, was in accordance with the Master Agreement's requirements. Glenn Industrial says it wasn't. If Georgia Power is right, then it's entitled to full indemnification from Glenn Industrial for the settled claims resulting from Alex Paxton's death. If Glenn Industrial is right, then it owes nothing to Georgia Power.

## FACTUAL BACKGROUND

Glenn Industrial's predecessor entity, Glenn Industrial Group, Inc., entered into a contract called the "Master Agreement" with Southern Company Services on September 30, 2018. [Doc. 61-1, ¶ 1]; [Doc. 65-2, ¶ 2]. Under the Master Agreement, Georgia Power is an "Affiliate" of Southern Company Services. [Doc. 61-1, ¶ 2]; [Doc. 65-4, p. 1]. As with most disputes involving contracts like the Master Agreement, two things come into play. First, there are the parties' obligations as outlined by the contract.

Put simply, "[s]uch a contract 'merely sets out the rules of the game in the event the parties decide to play ball.'" *Thurmond v. Delta Well Surveyors*, 836 F.2d 952, 953 (5th Cir. 1988) (citing *Page v. Gulf Oil Corp.*, 775 F.2d 1311, 1315 (5th Cir. 1985)). And second, there is the question of whether the parties' actions met those obligations. So, rather than jumping right to the all-important provision about indemnification, it's best to start with how the Master Agreement defines "Work," how that "Work" is "Authoriz[ed]" between Georgia Power and Glenn Industrial, and how they make "Changes" to that "Work," if necessary.

###### A.    <u>The Relevant Provisions of the Master Agreement</u>

###### 1.    <u>The "Work" Provision</u>

Glenn Industrial admits that it agreed to perform "Work," defined as "all supervision, labor, equipment, supplies, tools, materials, and consumables, . . . and miscellaneous services including but not limited to underwater services, barge services, and other waterway services." [Doc. 61-1, ¶ 3]; [Doc. 65-4, p. 1]. However, as Glenn Industrial points out, the Master Agreement "makes no promise of work." [Doc. 65-2, ¶ 34]; [Doc. 65-4, p. 1]; [Doc. 66-1, ¶ 3].

###### 2.    <u>The "Authorization" Provision</u>

In fact, under a paragraph labeled "'Authorization,' 'Authorizing Affiliate,' and 'Contract,'" the Master Agreement specifically states: **"**No Work shall be performed at or for any facility of any Southern Affiliate by [Glenn Industrial] by virtue of this Master

Agreement alone." [Doc. 61-1, ¶ 9]; [Doc. 65-2, ¶ 35]; [Doc. 65-4, p. 1]. Instead,

> The Work must be authorized hereunder, in writing, through issuance of a valid authorization executed and issued by an employee or authorized agent of the Southern Affiliate for whom the Work is to be performed (the "Authorizing Affiliate"), in the form of a work order, purchase order or other similar document (an "Authorization"). Each Authorization issued pursuant to this Master Agreement shall be a separate and independent contract ("Contract") between the Authorizing Affiliate issuing the Authorization and [Glenn Industrial], which Contract incorporates by reference all of the terms and conditions of this Master Agreement. The Contract shall consist of the following documents, which are listed in order of precedence:
>
> 1.  The Authorization;
> 2.  Modifications, if any;
> 3.  The Agreement;
> 4.  Special Conditions, if any;
> 5.  Authorizing Affiliate's Specifications;
> 6.  Authorizing Affiliate's Drawings, if any;
> 7.  The Proposal as may be revised and finally accepted in writing; and
> 8.  Such other documents as the parties may agree in writing.

[Doc. 65-2, ¶ 35]; [Doc. 65-4, pp. 1–2]. Authorizations made pursuant to the Master Agreement had to include, at a minimum: the date of the Authorization; the Authorization number; the Southern Affiliate and its department authorizing the Work; Work description information, including price or cost basis if Work is to be performed on a cost-plus basis, and scope of Work; the schedule of Work and site for which Work is to be performed; the address for invoices to be sent by Glenn Industrial; and such other documents as the Authorizing Affiliate deems appropriate. [Doc. 61-1, ¶ 10]; [Doc. 65-4, p. 2].

3.      The "Changes" Provision

Then, as for changes to the scope of the Work covered by an Authorization after

the Work begins, the Master Agreement states:

> The Authorizing Affiliate reserves the right, as the Work progresses, to make changes in the Scope of the Work as, in the judgment of the Authorizing Affiliate, may be necessary or expedient, and [Glenn Industrial] shall incorporate such changes in the Work. In the event any such change results in an increase or decrease in the costs to [Glenn Industrial], the contract price shall be adjusted accordingly. All claims for additional compensation as a result of changes must be promptly presented in writing.

[Doc. 61-1, ¶ 13]; [Doc. 65-4, p. 5].

4.      The "General Indemnity" Provision

And finally, as to the indemnification issue before the Court, the Master

Agreement provides:

> GENERAL INDEMNITY. To the fullest extent permitted by Applicable Laws, [Glenn Industrial] hereby agrees to indemnify, defend (if requested by the Southern Affiliate) and hold harmless any person and entity of the Persons Indemnified from and against any and all loss, damage, costs, or liability resulting from any and all demands, claims, suits, costs, fines, penalties, proceedings, or actions of any kind or character ("Claims") presented or brought against any person or entity of the Persons Indemnified caused by, arising out of, or related to any act or omission of [Glenn Industrial] or any of its Representatives, anyone directly or indirectly employed by any of them, or anyone for whose acts any one of them may be liable that is in any way associated with or connected with any obligation of [Glenn Industrial], any right of a Southern Affiliate, or any Work or other activities under the Agreement (including any work authorizations, purchase orders, or similar documents issued pursuant thereto), in whatever manner the same may be caused and regardless of whether the same may be caused by or arise out of the joint, concurrent, or contributory negligence of any person or entity of Persons Indemnified or

5

any other persons or entities not a Party to the Agreement; *provided, however*, if a Claim is determined to have been caused by the sole negligence[1] of any person or entity of the Persons Indemnified, then [Glenn Industrial] will not be liable for that Claim under this "General Indemnity" Section. [Glenn Industrial]'s indemnity obligation will include (without limitation) court costs, attorneys' fees, costs of investigation, costs of defense, expert fees and expenses, settlements, and judgments associated with any Claims.

[Doc. 61-1, ¶ 5]; [Doc. 65-2, ¶ 32]; [Doc. 65-4, p. 9 ¶ 21]. Although there are several other provisions of the Master Agreement, those just discussed are the relevant ones the parties look to in describing their contractual obligations. As can be assumed, those provisions set the framework for the ultimate question of whether Glenn Industrial is required to indemnify Georgia Power for Alex Paxton's death. With that, let's get to the underlying facts of this case.

   **B.    Alex Paxton's Death**

   In May 2020, when Georgia Power removed Oliver Dam's Unit 2 from service to perform maintenance, it noticed that portions of the Unit 2 trash racks were broken. [Doc. 61-1, ¶¶ 15–16]; [Doc. 61-3, Hardie Aff., ¶ 3]. So that the trash racks could be inspected and repaired, Georgia Power contracted with Glenn Industrial. [Doc. 61-1, ¶ 16]. According to Richard Glenn, who testified on behalf of Glenn Industrial as its representative under Federal Rule of Civil Procedure 30(b)(6) in this case, once Glenn Industrial received the work request from Georgia Power, it prepared and submitted a

---

[1] Glenn Industrial also "admits" that it "is not arguing in this case that Georgia Power was solely negligent." *See* [Doc. 61-1, ¶ 6], *in connection with* [Doc. 66-1, ¶ 6]; [Doc. 61-2, p. 29, Glenn Rule 30(b)(6) Depo., 59:7–10].

proposal "along with the dive operations plan," a job hazard analysis ("JHA"), and its equipment certifications. [Doc. 61-2, p. 11, Glenn Rule 30(b)(6) Depo., 30:22–25]. Then, after reviewing the "procedure and scope of work" put together by Glenn Industrial, Georgia Power issued two purchase orders[2] to Glenn Industrial for the Unit 2 trash rack work. [Doc. 61-1, ¶¶ 15–17]; [Doc. 61-2, p. 12, Glenn Rule 30(b)(6) Depo., 34:1–11]; [Doc. 61-3, Hardie Aff., ¶¶ 3–4]. "[A]t that point," the purchase order was "for billing purposes"—just to ensure that Glenn Industrial got paid. [Doc. 61-2, p. 12, Glenn Rule 30(b)(6) Depo., 34:12–18].

The first of the two purchase orders was GPC62520-0010 ("GPC PO 10"), and the second was GPC62520-0013 ("GPC PO 13") issued on August 17, 2020. [Doc. 61-1, ¶ 18]; [Doc. 61-3, Hardie Aff., ¶¶ 3–4]; [Doc. 61-3, pp. 6–10]. GPC PO 13 authorized the amount of payment Glenn Industrial would receive to "[p]rovide services and materials for Oliver Dam Trash Rack Tie In." [Doc. 61-1, ¶ 19]; [Doc. 61-3, Hardie Aff., ¶ 4]; [Doc. 61-3, p. 6]. As for labor and equipment, GPC PO 13 authorized funds to Glenn Industrial for the trash rack work to cover a five-person dive team working 10-hour shifts over a period of eight days. [Doc. 61-1, ¶ 26]. On multiple occasions, from May 2020 to early October 2020, Glenn Industrial worked at Oliver Dam to inspect and repair the trash racks. [*Id.* at ¶ 16]. "[P]rior to October 27, 2020," Glenn Industrial had

---

[2] Although the Court didn't make note of it above when discussing the "Authorization" provision, a purchase order is a type of "Authorization" permitted by the Master Agreement. [Doc. 65-4, pp. 1–2].

"completed all trash rack work," and it didn't "anticipate any subsequent work that needed to be done." [Doc. 61-2, p. 20, Glenn Rule 30(b)(6) Depo., 49:1–4]; [Doc. 65-2, ¶ 9]; [Doc. 65-5, p. 5, Bradley Depo., 231:22–24]; [Doc 65-6, p. 5, Hardie Depo., 92:16–18]; [Doc. 68-1, p. 10 ¶ 9]. After Glenn Industrial completed its trash rack work, Georgia Power attempted to bring Unit 2 back into operation. [Doc. 61-1, ¶ 23]; [Doc. 61-3, Hardie Aff., ¶ 5]. However, when Georgia Power attempted to raise the Unit 2 middle headgate during the restart process, the headgate's chain broke. [Doc. 61-1, ¶ 24]; [Doc. 61-3, Hardie Aff., ¶ 5].

Wayne Hardie, Georgia Power's Chattahoochee Hydro River Manager in October 2020, called Glenn Industrial and asked it to send a dive team back to Oliver Dam to investigate and repair the headgate's chain. [Doc. 61-1, ¶ 25]; [Doc. 61-2, p. 18, Glenn Rule 30(b)(6) Depo., 47:5–14]; [Doc. 61-3, Hardie Aff., ¶ 2]. Mr. Glenn testified that during his and Mr. Hardie's discussion regarding the headgate's broken chain, they talked about what could have possibly caused the chain to break, what equipment Glenn Industrial may need, the number of people for the job, and "applying this to the work that [it] had done"—to GPC PO 13. [Doc. 61-2, p. 18, Glenn Rule 30(b)(6) Depo., 47:5–17]. During his Rule 30(b)(6) deposition, Mr. Glenn explained that he was going to apply the work for the headgate's chain to GPC PO 13 because there was "money left in the budget." [*Id.* at p. 18, Glenn Rule 30(b)(6) Depo., 47:18–21]. In other words, because Glenn Industrial completed the trash rack work under GPC PO 13 in less time than

8

budgeted, Mr. Glenn testified that it was his understanding that Glenn Industrial was "authorized to then proceed with the plan" to repair the headgate's chain.[3] [Doc. 61-1, ¶ 26]; [Doc. 61-2, p. 18, Glenn Rule 30(b)(6) Depo., 47:22–25]; [Doc. 66-1, ¶ 26]. After all, Glenn Industrial had previously done work for Georgia Power "under a purchase order that had remaining funds in it instead of . . . asking for a new one[.]" [Doc. 61-2, p. 20, Glenn Rule 30(b)(6) Depo., 49:14–20]. Even on this occasion, Glenn Industrial "never asked Georgia Power to issue a new purchase order." [*Id.* at p. 20, Glenn Rule 30(b)(6) Depo., 49:11–13]. As scheduled—and without a new purchase order—Glenn Industrial's dive team arrived at Oliver Dam to repair the headgate's chain on October 27, 2020, but Alex Paxton died while diving under the water to inspect it.[4] [Doc. 61-1, ¶¶

---

[3] Glenn Industrial admits that Mr. Glenn "generally stated that [GPC PO 13] applied to the subject work and that [Glenn Industrial] was operating under [GPC PO 13]." [Doc. 65-2, ¶ 39]; [Doc. 65-3, pp. 6–7, Glenn Rule 30(b)(6) Depo., 47:10–48:4]; *see also* [Doc. 61-2, p. 18, Glenn Rule 30(b)(6) Depo., 47:5–17]. However, Mr. Glenn also stated in his deposition that his dealings with Mr. Hardie for the headgate's chain work "were all verbal and that there was nothing in writing with respect to the work on the headgate['s] chain." [Doc. 65-2, ¶ 41]; [Doc. 65-3, pp. 8–9, Glenn Rule 30(b)(6) Depo., 60:25—61:6].

[4] Throughout its brief and Statement of Material Facts [Doc. 65-2] in support of its Motion for Summary Judgment [Doc. 65], Glenn Industrial heavily focuses on things related to the cause of Alex Paxton's death—things like when and why the penstock priming valve for Unit 2 was being opened prior to the dive, what constitutes proper "lock out" or "tag out" procedures for worker safety, and whether Georgia Power followed those procedures. [Doc. 65-1, p. 3 n.3]; [Doc. 65-2, ¶¶ 10–31]. Inclusion of these issues and Georgia Power's responses to them is without a doubt the product of thorough and excellent counsel from both Glenn Industrial and Georgia Power's attorneys. [Doc. 65-2, ¶¶ 10–31]; [Doc. 68-1, ¶¶ 10–31]. However, neither Glenn Industrial's negligence nor Georgia Power's is at issue because, as mentioned above, all claims relating to liability for Alex Paxton's death were settled out of court in mid-2023. [Doc. 61, p. 2 n.1]; [Doc. 61-1, ¶ 51]; [Doc. 61-5, p. 6]. Again, since Glenn Industrial "is not arguing . . . that Georgia Power was solely negligent," "liability is not a factor in the indemnity analysis," and the only dispute for resolution is whether the indemnification provision of the Master Agreement applied to the work Glenn Industrial performed at Oliver Dam on October 27, 2020. *See supra* note 1; [Doc. 60, p. 1]; [Doc. 61-1, ¶ 50]; [Doc. 65-2, ¶ 31].

33–34]; [Doc. 61-2, p. 20, Glenn Rule 30(b)(6) Depo., 49:21–24].

**C.    Glenn Industrial's Invoice and Georgia Power's Purchase Orders**

Dated November 30, 2020, Glenn Industrial submitted an invoice to Georgia Power identifying the contract number as the same one associated with GPC PO 13. [Doc. 61-1, ¶ 38]; [Doc. 61-2, pp. 22–23, Glenn Rule 30(b)(6) Depo., 52:17—53:5]; *compare* [Doc. 61-2, p. 65], *with* [Doc. 61-2, p. 74]. In addition to listing the dates Glenn Industrial was onsite at Oliver Dam—from September 29 through October 5, 2020, and October 26 through October 28, 2020—the invoice also included expenses associated with Glenn Industrial's work performed on those days. [Doc. 61-1, ¶ 39]; [Doc. 61-2, p. 74]. According to Mr. Glenn, this invoice "is what Glenn Industrial submitted to Georgia Power in order to be paid for the work that was performed under [GPC PO 13]." [Doc. 61-2, p. 24, Glenn Rule 30(b)(6) Depo., 54:20–24]. Of course, Georgia Power paid Glenn Industrial "for the work performed under GPC PO 13," and Glenn Industrial also admits that it "was paid for the work it did on October 27, 2020." [Doc. 61-1, ¶¶ 22, 41]; [Doc. 61-2, pp. 24–25, Glenn Rule 30(b)(6) Depo., 54:20—55:2]. The question is, though, under what purchase order did Glenn Industrial perform its work on October 27, 2020?

Georgia Power points to the fact that Glenn Industrial made statements confirming that the work performed on October 27, 2020, was performed under GPC PO 13. [Doc. 61-1, ¶ 42]. Following a request for information from an Occupational Safety and Health Administration ("OSHA") investigator, Glenn Industrial's Safety

Manager, Joshua Cable, sent an email on March 15, 2021, discussing the work Glenn Industrial performed under both GPC PO 10 and GPC PO 13. [Doc. 61-2, p. 21, Glenn Rule 30(b)(6) Depo., 50:19–20]; [Doc. 61-2, p. 71]. In this email, Mr. Cable stated that GPC PO 10 quoted the use of a Remotely Operated Vehicle ("ROV") "for [Glenn Industrial's] *initial investigation* of the trash rack failure at Unit 2 of Oliver Dam." [Doc. 61-2, p. 71 (emphasis added)]. Glenn Industrial used the ROV to "determine the cause of the failure," and to check for things like "jagged steel," "concrete damage," and other "unknown hazards associated with the missing and damaged trash rack sections" so that its divers could safely enter the water. [*Id.*].

Now, as for GPC PO 13, "[a]n ROV was not required," and Mr. Cable noted that GPC PO 13's "original scope . . . was to *replace* the damaged and missing trash rack sections with new ones and wrap cables around the remaining racks." [*Id.* (emphasis added)]. Glenn Industrial, of course, completed that work, but not long after, if you recall, the Unit 2 middle headgate's chain broke. [Doc. 61-1, ¶¶ 23–24]; [Doc. 61-3, Hardie Aff., ¶ 5]. Consistent with the testimony from Mr. Glenn, Mr. Cable also indicated that "[t]here were additional funds remaining [under GPC PO 13] after the trash rack [work], which allowed Georgia Power to add additional work to [that purchase order]." [Doc. 61-2, p. 71]. "The added scope was to inspect the headgate['s] lifting chain at Unit 2 and reconnect it, if possible." [*Id.*]. Not only does Mr. Cable's email highlight the differences between GPC PO 10 and GPC PO 13, but it also bolsters

Georgia Power's contention that the work performed on October 27, 2020, was done under GPC PO 13. In his email to the OSHA investigator, Mr. Cable wrote, "When the incident with Alex Paxton occurred, [Glenn Industrial] *was working under* [GPC PO 13]." [*Id.* (emphasis added)].

While these facts are lifted directly from Mr. Glenn's Rule 30(b)(6) deposition and Mr. Cable's email to the OSHA investigator, Glenn Industrial denies that it ever confirmed to have *performed* work on October 27, 2020, under GPC PO 13 even though it "expected payment from the funds left over from [that purchase order]." [Doc. 66-1, ¶ 42]. To put it simply, it's Glenn Industrial's position that even though there were funds left over from GPC PO 13, the Master Agreement required Georgia Power to issue a new purchase order for it to come back to Oliver Dam between the dates of October 26 and October 28, 2020. [Doc. 61-2, p. 74]. Since there wasn't a new purchase order, Glenn Industrial flatly denies that GPC PO 13 "applied to the dive in question" and disputes that Georgia Power paid for the headgate's chain repair work pursuant to GPC PO 13 and under the terms of the Master Agreement. [Doc. 66-1, ¶¶ 32, 43]; *but see, e.g.*, [Doc. 61-2, pp. 23–24, Glenn Rule 30(b)(6) Depo., pp. 53:2—55:2]. In fact, Glenn Industrial urges the Court to pay no heed to what it brands as Mr. Cable's "loose" description of how Georgia Power paid for the work on the headgate's chain. [Doc. 66-1, ¶ 43]. This is an understandable suggestion since Mr. Cable isn't Glenn Industrial's Rule 30(b)(6) deponent. Even still, though, that doesn't remove Mr. Cable's words as considerable

evidence that works against Glenn Industrial when it comes to its understanding of exactly what GPC PO 13 covered. Nevertheless, if you were to remove Mr. Cable's email from the possibility that it could be construed as some sort of legally binding admission on Glenn Industrial's part, what else is there? *See* [*id*].

The only other thing that the parties discuss is an excerpt of Mr. Glenn's deposition taken by the United States Department of Labor during OSHA's investigation into the incident with Alex Paxton. *See generally* [Doc. 61-4]. Mr. Glenn—testifying in his individual capacity rather than Glenn Industrial's representative as he did for this lawsuit—testified under oath as follows:

> We had completed the trash rack project by, you know, reinstalling new sections and cabling the existing ones. We had done it under schedule and under budget. Apparently, sometime after we had left until we came back on [October 27, 2020], [Georgia Power] had tried to pull the headgate up to operate the unit. The headgate, apparently, the chain broke. They didn't know why. So[,] they brought us in and asked us since we had enough money in the original purchase order we would just piggyback onto that and use the trash rack purchase order to come back for a day and look at the chain, see what needed to be done, if it could be rehooked or if we had to, you know, make other arrangements. So[,] that was essentially the procurement process. We had an existing [purchase order] that had money left in the budget and we utilized *that* to come back for one day, but we had to, you know, go through the process. We resubmitted dive op[eration] plans, JHAs, the whole nine yards."

[*Id.* at p. 3, Glenn Sec. of Lab. Depo., p. 42:3–21 (emphasis added)]; *see also* [Doc. 61-2, p. 20, Glenn Rule 30(b)(6) Depo., 49:7–10]; [Doc. 66-1, ¶ 45]. Glenn Industrial argues that Mr. Glenn's testimony to OSHA is ambiguous—that "*that*" refers to "money left in the budget," not to GPC PO 13. [Doc. 66-1, ¶ 45]; *see also* [Doc. 61-4, p. 3, Glenn Sec. of Lab.

Depo., p. 42:17–20 (emphasis added)]. Although Mr. Glenn's testimony to OSHA may be ambiguous when it comes to resolving the ultimate issue before the Court, the testimony he provided as Glenn Industrial's Rule 30(b)(6) representative leaves much less to the imagination.

> Q:    And when you performed the work[,] you believed that you were operating under the terms and conditions of [GPC PO 13] and the master services agreement?
>
> A:    Yes.

[Doc. 61-2, p. 30, Glenn Rule 30(b)(6) Depo., 60:5–9]. With the foregoing in mind, the Court turns to the parties' summary-judgment arguments.

## DISCUSSION

### A.    **Legal Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"The moving party bears the initial responsibility of informing the court of the basis for its motion." *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991). The movant may cite to particular parts of materials in the record, including, "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986)); Fed. R. Civ. P. 56(c)(1)(A). "When the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 323). Rather, "the moving party simply may show—that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* (quoting *Celotex*, 477 U.S. at 324) (cleaned up). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.*

If this initial burden is satisfied, the burden then shifts to the nonmoving party, who must rebut the movant's showing "by producing . . . relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The nonmoving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or[] is not significantly probative' of a disputed fact." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)). "A mere scintilla of evidence supporting the [nonmoving] party's position will not suffice," and summary judgment cannot be defeated through bare and self-serving allegations. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *Hall v. Skipper*, 808 F. App'x 958, 959 (11th Cir. 2020) (citing *Stewart v. Booker T. Wash. Ins.*, 232 F.3d 844, 851 (11th Cir. 2000)).

**B.**   **Choice of Law**

The Master Agreement contains a choice of law provision stating that "[a]ll disputes relating to the execution, interpretation, construction, performance, or enforcement of the Agreement and the rights and obligations of the Parties hereto shall be governed by the laws of . . . the Authorizing Affiliate's state of incorporation." [Doc. 65-4, pp. 23–24]. That, of course, would be Georgia. [Doc. 1-1, p. 3 ¶ 6]; [Doc. 4, p. 5 ¶ 6].

**C.**   **Contract Interpretation Under Georgia Law**

Finally, as to the unresolved indemnification claim—whether the "General Indemnity" provision of the Master Agreement applied to the work Glenn Industrial performed on the day Alex Paxton died—the sole issue is one of contract interpretation. If there isn't a factual matter that must be determined by a jury[5] or an ambiguity in terms, the construction of a contract is a question of law for the court "peculiarly well suited for disposition by summary judgment." O.C.G.A. § 13-2-1; *Serv. Merch. Co. v. Hunter Fan Co.*, 617 S.E.2d 235, 237 (Ga. Ct. App. 2005). "However, "[n]o construction is required or even permissible when the language employed by the parties in the contract is plain, unambiguous and capable of only one reasonable interpretation.'" *Nguyen v. Lumbermans Mut. Cas. Co.*, 583 S.E.2d 220, 223 (Ga. Ct. App. 2003) (citation omitted). Therefore, the Court must first determine whether the contract's language is clear and

---

[5] Glenn Industrial and Georgia Power have agreed to "waive their right to a trial by jury as it relates to the resolution" of the indemnification claim. [Doc. 59, ¶ 2].

unambiguous. *See City of Baldwin v. Woodard & Curran, Inc.*, 743 S.E.2d 381, 389 (Ga. 2013). If the contract's language is clear, then it will be enforced according to its clear terms, and only the contract "is looked to for its meaning." *Id.* Next, if the contract's language is ambiguous, then courts must apply the rules of construction to resolve the ambiguity. *Id.* "The cardinal rule," of course, "is to ascertain the intention of the parties." *Serv. Merch.*, 617 S.E.2d at 237. If the parties' intention is certain by looking at the language they used, their intention "will prevail over all other considerations, in determining the nature of the agreement." *Id.* But, if some ambiguity remains in the contract after application of the rules of construction, "the issue of what the ambiguous language means *and* what the parties intended must be resolved by a [fact finder]."[6] *City of Baldwin*, 743 S.E.2d at 389 (emphasis added); *see supra* note 5.

## D.    Glenn Industrial Must Indemnify Georgia Power

Contrary to Glenn Industrial's contentions, the Master Agreement and the

---

[6] As a sidenote for indemnity provisions, a few things must be kept in mind—"the words of a contract of indemnification must be construed strictly against the indemnitee," here, that would be Georgia Power; "every presumption is against such intention [to indemnify]"; and "[w]hen an indemnity agreement is ambiguous, such ambiguity must be construed against the drafter . . . ." *Serv. Merch.*, 617 S.E.2d at 237–38. Although Georgia Power likely drafted the Master Agreement in its entirety, Mr. Glenn testified that he doesn't remember whether he negotiated any changes or edits to it before signing.  [Doc. 61-2, p. 4–5, Glenn Rule 30(b)(6) Depo., 22:9–16, 23:1–11].

In its Statement of Material Facts, Glenn Industrial states that Georgia Power drafted the Master Agreement and that Glenn Industrial "made no changes to th[e] [c]ontract (other than possibly negotiating the rates or amounts charged for services rendered)." [Doc. 65-2, ¶ 4]. However, Glenn Industrial failed to support that factual allegation with a "specific citation to particular parts of materials in the record." LR 56, MDGa. Therefore, the Court cannot consider that allegation as an established fact. *Id.*; *see also* [Doc. 68-1, ¶4].

"General Indemnity" provision contained therein were in effect at the time of Alex Paxton's death because even though there wasn't a *new* purchase order issued specifically mentioning the repair work for the headgate's chain, there was a change in the scope of the work covered by GPC PO 13. [Doc. 65-1, p. 12]. Of course, what the "Work" and "Authorization" provisions say are unambiguously clear and critical to the indemnification issue, but there is another provision in the mix as well.

First, to reiterate: "No Work shall be performed . . . by virtue of th[e] Master Agreement alone." [Doc. 65-4, p. 1]. Second, "[t]he Work *must be authorized hereunder, in writing*, through the issuance of a valid authorization . . . in the form of a work order, purchase order or other similar document . . . ." [*Id.* (emphasis added)]. Third, "[e]ach Authorization issued pursuant to th[e] Master Agreement shall be a separate and independent contract . . . ." [*Id.*]. And, when it comes to Work to be performed, "The Authorization"—or purchase order—is the very first document required for the Master Agreement to apply. To phrase it as Glenn Industrial does: "[W]ithout a written purchase order, the Master Agreement is lifeless." [Doc. 65-1, p. 12].

To be clear, when it comes to Glenn Industrial's contention that "[t]here was no purchase order and nothing in writing for the . . . work that [Alex] Paxton was performing" on October 27, 2020, it's absolutely right. [*Id.* at p. 13]. The trash rack work under GPC PO 13 was completed before October 27, 2020, and the only "approval" for the work on the headgate's chain was verbal, obviously coming from Mr. Glenn's

conversation with Mr. Hardie. [Doc. 61-2, p. 20, Glenn Rule 30(b)(6) Depo., 49:1–4]; [Doc. 65-2, ¶ 9]; [Doc. 65-3, pp. 8–9, Glenn Rule 30(b)(6) Depo., 60:25—61:3]; [Doc. 65-5, p. 5, Bradley Depo., 231:22–24]; [Doc 65-6, p. 5, Hardie Depo., 92:16–18]; [Doc. 68-1, p. 10 ¶ 9]. Based on that, Glenn Industrial argues that "[t]here is no provision in the Master Agreement [that] authorizes an oral agreement for wholly separate work [that] has not been authorized in writing." [Doc. 65-1, pp. 13–14].

However, the "Changes" provision of the Master Agreement permitted just that. Georgia Power, as an Authorizing Affiliate, had the right "to make *changes* in the Scope of the Work," and nowhere in that provision does it say that those changes had to be in writing. [Doc. 65-4, p. 5 (emphasis added)]. In fact, the only writing requirement under the "Changes" provision falls to Glenn Industrial: "*All claims for additional compensation as a result of changes*" to the "Scope of the Work" "*must be presented promptly in writing.*" [*Id.* (emphasis added)]. In other words, the Master Agreement only requires an additional writing where changes result in a claim for *more money* to be paid by Georgia Power to Glenn Industrial. *See* [Doc. 61, p. 14]; [Doc. 61-2, p. 10, Glenn Rule 30(b)(6) Depo., 28:13–24]. And, as you'll recall, there were funds left over from GPC PO 13. [Doc. 61-2, p. 18, Glenn Rule 30(b)(6) Depo., 47:18–21]. Thus, the Master Agreement permitted Georgia Power to verbally modify the scope of work covered by GPC PO 13 because the repair work for the headgate's chain didn't result in Glenn Industrial needing to make a claim for additional compensation. Moreover, GPC PO 13's "Terms and Conditions"

clearly states that Georgia Power "may, at any time, make changes in the goods and other requirements, including quantities, if such changes can be reasonably effected by [Glenn Industrial]." [Doc. 61-2, p. 67]. So, when asked about the fine print from GPC PO 13 as well, Mr. Glenn testified that "the potential for changes" was anticipated between Glenn Industrial and Georgia Power. [Doc. 61-2, pp. 13–14, Glenn Rule 30(b)(6) Depo., 42:21—43:13].

With the "Scope of the Work" changed as a result of Mr. Glenn's conversation with Mr. Hardie, the "Work" for the headgate's chain performed by Alex Paxton on October 27, 2020, was undoubtedly authorized by GPC PO 13. [Doc. 65-4, p. 5]. To split the contractual hair as Glenn Industrial does would go against its course of conduct with Georgia Power. Under Georgia law, "terms of a written contract may be modified or changed by a subsequent or parol agreement between the parties, where such agreement is founded on sufficient consideration." *Hanham v. Access Mgmt. Grp., L.P.*, 825 S.E.2d 217 (Ga. 2019) (citations omitted). Parol agreements between parties can be evidenced either through their course of conduct or through oral modifications. *Id.*

Georgia law permitted Glenn Industrial and Georgia Power to modify the Master Agreement so long as there was mutual consent to do so. "[A] written contract may be modified by mutual consent of the parties, which need not be expressed in words, in writing or signed, but the parties must manifest their intent to modify the original contract." *Falcone Glob. Sols., LLC v. Maurice Ward Networks, Ltd.*, No. 1:18-CV-3379-

MHC, 2020 WL 10090873, *6 (N.D. Ga. Aug. 25, 2020) (quoting *Ryder Truck Lines v. Scott*, 201 S.E.2d 672, 675 (Ga. Ct. App. 1973)). In its prior dealings with Georgia Power, Glenn Industrial worked "under a purchase order that had remaining funds in it instead of . . . asking for a new one[.]" [Doc. 61-2, p. 20, Glenn Rule 30(b)(6) Depo., 49:14–20]. This is exactly what Glenn Industrial intended to do with respect to the repair work for the headgate's chain. Here, the evidence shows that Glenn Industrial and Georgia Power, by their oral agreement and course of conduct, modified GPC PO 13's scope of work to include the work performed on October 27, 2020.

This conclusion aligns perfectly with Mr. Glenn's understanding of what he discussed with Mr. Hardie about the scope of work. As Mr. Glenn testified, both Glenn Industrial and Georgia Power understood the work would be authorized, completed, and paid for under GPC PO 13. As to the requisite "Authorization" for the "Work," Mr. Glenn

Q:    . . . discussed the scope of work with . . . ?

A:    Wayne Hardie.

Q:    With Wayne Hardie. Okay. And what did you . . . discuss?

A:    We discussed what the possibility might be of what we may find, what equipment we may need, number of people, and then we—we talked about the—you know, applying this to the work that we had done.

Q:    When you say[,] "applying this to the work," do you mean applying it to [GPC PO 13]?

21

A:      Yes.

Q:      Okay. And why were you going to apply the work that you were doing to fix the [headgate's] chain to [GPC PO 13]?

A:      We had money left in the budget.

Q:      Okay. All right. And so[,] did you understand that you were authorized to then proceed with the plan to repair the [headgate's] chain?

A:      Yes.

Q:      Okay. And that authorization would come from [GPC PO 13]?

                            …

[A:]    Yes.

                            …

Q:      All right, Mr. Glenn. When Glenn Industrial agreed to do the [headgate's] chain repair work in October of 2020, you knew you were acting under the scope of [GPC PO 13], right?

A.      We were—we were asked to when I had my conversation with Wayne Hardie.

Q:      Okay. And so[,] your understanding is that you were acting under the scope of that [GPC PO 13], correct?

A:      Yes, I—yes.

[Doc. 61-2, pp. 18–19, 26–27, Glenn Rule 30(b)(6) Depo., 47:8—48:4, 56:22—57:6]. Then, as for payment, Glenn Industrial's invoice to Georgia Power for the repair work on the headgate's chain performed on October 27, 2020, expressly stated it was performed under GPC PO 13. [*Id.* at pp. 22–25, Glenn Rule 30(b)(6) Depo., 52:7—55:2]. Clearly

listed in the description on Glenn Industrial's invoice to Georgia Power are the dates of September 29 through October 5, 2020, and October 26 through October 28, 2020—which, of course, includes October 27, 2020. *See, e.g.,* [Doc. 61-3, p. 12].

So, since the work performed on October 27, 2020, was "arising out of" or "related to" a valid, *written* purchase order as required by the Master Agreement, the provision titled "General Indemnity" requires Glenn Industrial to indemnify Georgia Power for the settled claims resulting from Alex Paxton's death.[7] Considering the applicable law alongside all the depositions, affidavits, and many documents that comprise this record, it would be the Court's decision—even in deciding this case during a bench trial—that Glenn Industrial and Georgia Power changed the scope of work initially authorized by GPC PO 13. *See supra* note 5. When Georgia Power issued GPC PO 13 on August 17, 2020, it was only for work related to the broken trash racks for Unit 2. [Doc. 61-2, p. 65]. But because Glenn Industrial commonly performed additional work under what would normally be an expired purchase order with left over funds, Mr. Glenn and Mr. Hardie verbally modified GPC PO 13 such that Master Agreement's requirements were alive as to the work performed on October 27, 2020. The repair work for the headgate's chain *was* done pursuant to a valid written Authorization—GPC PO 13. Accordingly, Georgia Power is entitled to indemnification.

---

[7] "Arising out of" and similar phrases "clearly evidence[] an intent that the indemnification provision be construed broadly." *Natco Ltd. P'ship v. Moran Towing of Fla., Inc.,* 267 F.3d 1190, 1194 n.4 (11th Cir. 2001).

## <u>CONCLUSION</u>

Based on the undisputed facts of this case and for the reasons discussed above, the Court **GRANTS** Georgia Power Company's Motion for Summary Judgment [Doc. 61] and **DENIES** Glenn Industrial Group, LLC's Motion for Summary Judgment [Doc. 65]. The Court **DIRECTS** the Clerk of Court to **ENTER** Judgment accordingly.

**SO ORDERED**, this 8th day of April, 2024.

<u>S/ Tilman E. Self, III</u>
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**